# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

LORINE BLAKELY, LILLIAN M. BROWN,  )
TIERNEY LOKEY, MABEL OWUSU,   )
KIA THOMAS, LEOLA NANCY STONE,  )
JULIA E. ROGERS, VERRETTA TERRY,  )
ANGELA SALES-STEPHENS,   )
ANGELA L. WALKER, MARLO WILLIAMS, )
MARY B. WILLIAMS,   )
   )
    Plaintiffs,   )
   )
    v.   )    No. 2:10 CV 342
   )
BIG LOTS STORES, INC.,   )
   )
    Defendant.   )

## OPINION AND ORDER

Defendant Big Lots Store, Inc. ("Big Lots" or "defendant") has moved for summary judgment on plaintiff Angela Sales-Stephens's ("plaintiff") claims against it. (DE # 72.) Plaintiff has filed a response to this motion (DE # 75), and defendant has filed a reply (DE # 79.) For the following reasons, defendant's motion is denied.

## I.    Facts and Procedural History

In the summary that follows, the court refers only to undisputed facts, or, if there is a dispute, notes that it exists and relies on the version of the fact, or inference therefrom, that is most favorable to plaintiff. This summary provides an overview. Additional relevant undisputed facts will be referred to in the analysis that follows. The court will do its best to summarize the facts in a chronological order.

Big Lots is a national retailer that focuses on selling closeout and discounted merchandise. (DE # 70 at 2; DE # 75-1 at 21-22; DE # 1 at ¶ 15.) Plaintiff began her career at Big Lots in 1993 as a part-time cashier. (DE # 75 at 6; Sales-Stephens Deposition pages 176-77.) Plaintiff eventually became store manager of Store # 1739 in Merrillville, Indiana, around 2004, and held that position for approximately five or six years. (DE # 75 at 6; DE # 75-1 at 23; Sales-Stephens Deposition page 183.) Plaintiff's duties as store manager included merchandising, operations, staff selection, and management of the store. (DE # 75 at 6; DE # 75-2 at 1.) Plaintiff, who is Caucasian, is married to an African-American man, and has five biracial children. (DE # 70 at 2; DE # 75-1 at 19; Sales-Stephens Deposition page 113.)

As the store manager, plaintiff received annual performance reviews from Mike Batka ("Batka"), the district manager for the Merrillville Big Lots location.[1] (DE # 71-5 at 33; Sales-Stephens Deposition page 53; DE # 71-13 at 2.) In her 2006[2] performance review, plaintiff was given an overall rating of "very good."[3] (DE # 71-11 at 3.)

---

[1] In its reply brief, defendant argues that plaintiff has failed to present evidence that Batka was a district manager. (DE # 79 at 8.) Defendant's own statement of material facts, however, refers to Batka as a district manager. (DE # 70 at 2.)

[2] Although the performance review is titled 2007 Store Management Performance Appraisal, it actually reviewed plaintiff's performance for the 2006 calender year. (DE # 71-5 at 32-33; Sales-Stephens Deposition pages 52-23.)

[3] Defendant argues that plaintiff's 2006 review indicated that plaintiff began to experience performance problems as early as 2006. (DE # 70 at 4.) Specifically, defendant points to the following language in plaintiff's performance review for 2006: "Surround yourself with the best leaders by developing the assistant and associate managers and addressing their performance issues." (*Id.*; DE # 71-11 at 3.) The court

Plaintiff's performance was reduced from "very good" to "good" in her 2007 performance review. (DE # 71-13 at 3.) Batka's comments in her 2007 performance review indicate that he thought plaintiff needed to improve her performance in some areas. (*Id.*) Specifically, Batka stated: "[Plaintiff] [n]eeds to show immediate improvement on company/regional/district directives, to be measured immediately." (*Id.*) Additionally, Batka also indicated that plaintiff needed to "work to improve the performance of her management team" and "work to develop her team to be better merchants through more training and hiring some new talent." (*Id.*)

In 2008, Big Lots instituted a new quality assurance initiative known as "Ready For Business." (DE # 70 at 3; Sales-Stephens Deposition page 62; DE # 71-5 at 36.) The "Ready For Business" initiative was aimed at, among other things, improving store appearance, increasing customer traffic, increasing the amount of time and money customers spent in the store, reducing losses, and improving profits. (DE # 70 at 3-4; Sales-Stephens Deposition pages 61-67; DE # 75-1 at 35-41.)

In October or November of 2008, Batka visited the Merrillville store, which employed primarily African-American employees. (DE # 75 at 6; Sales-Stephens Deposition page 33; DE # 75-1 at 10; Batka Deposition page 107; DE # 75-3 at 4.) Batka and plaintiff, who was the store manager at that time, walked around the store

---

does not believe this is necessarily a negative reflection of plaintiff's performance. In fact, the overall comments section of plaintiff's 2006 performance review, plaintiff's supervisor stated: "It is a pleasure having [plaintiff] leading the Merrillville store and we will build off the success in 2006 for an even better 2007." (DE # 71-11 at 3.)

observing the employees. (DE # 75 at 6; Sales-Stephens Deposition page 34; DE # 75-1 at 11.) At that point, Batka told plaintiff that she did not have "the right caliber of employees in [her] store."[4] (DE # 75 at 6; Sales-Stephens Deposition page 34; DE # 75-1 at 11.) As they continued to walk through the store, they walked past employee Mabel Owusu, and Batka told plaintiff that Owusu was "just a high-priced stocker." (Sales-Stephens Deposition page 34; DE # 75-1 at 11.) Additionally, Batka told plaintiff that employee Leola "Nancy" Stone was just a "high-priced" bookkeeper that could not perform management duties. (Sales-Stephens Deposition page 34; DE # 75-1 at 11.) Batka also told plaintiff that she needed to get rid of Lorine Blakely, who he described as "dead weight."[5] (DE # 75 at 6; Sales-Stephens Deposition page 102; DE # 75-1 at 17.) Then, after plaintiff and Batka returned to the store's office, Batka told plaintiff that she needed to "diversify [her] store." (DE # 75 at 6; Sales-Stephens Deposition page 34; DE # 75-1 at 11.) In response, plaintiff told Batka that she did not see anything wrong with the employees that were currently working at the store. (Sales-Stephens Deposition page 35; DE # 71-5 at 29.)

In November of 2008, plaintiff set up a hiring table at the Merrillville store to hire new employees for the Christmas season. (DE # 75 at 6; Sales-Stephens Deposition page

---

[4] Defendant does not concede that Batka made any of the statements that follow, but assumes, for the purposes of summary judgment, that he did. (DE # 79 at 3.)

[5] Plaintiff testified in her deposition that she had reprimanded Blakely for poor performance. (Sales-Stephens Deposition pages 102-104; DE # 71-5 at 66-68.) Additionally, Batka testified that plaintiff had also complained about the performance of Stone and Owasu. (Batka Deposition pages 120-123; DE # 71-1 at 6-9.)

36; DE # 75-1 at 12.) A short time later, after Batka returned to the Merrillville store, plaintiff asked Batka to look over the holiday applications with her. (DE # 75 at 6; Sales-Stephens Deposition page 36; DE # 75-1 at 12.) At that point, Batka told plaintiff that she just needed to pull applications from the Highland and Portage Big Lots stores.[6] (DE # 75 at 6-7; Sales-Stephens Deposition page 36; DE # 75-1 at 12.)

As a result of this conversation with Batka, plaintiff called the Portage store, and spoke to an employee named Sheryl,[7] the Portage store manager. (DE # 75 at 7; Sales-Stephens Deposition page 16; DE # 75-1 at 6.) Plaintiff told Sheryl she did not think it was fair that Batka wanted her to get applications from outside of her area, and also told Sheryl she thought Batka's request was "a racial thing." (DE # 75 at 7; Sales-Stephens Deposition page 17; DE # 75-1 at 7.) Ultimately, plaintiff did not get any applications from the Portage store or hire anyone from that store. (DE # 75 at 7; Sales-Stephens Deposition pages 37-38; DE # 75-1 at 13-14.) Instead, plaintiff hired applicants

---

[6] In her brief, plaintiff alleges that the applications for the Merrillville store were from primarily African-American applicants, and that the applications from the Portage and Highland stores were primarily from Caucasian applicants. (DE # 75 at 6-7.) Defendant argues that plaintiff has not supported these claims with evidence. (DE # 79 at 4.) The portion of her own deposition that plaintiff cites to support this allegation does not mention anything regarding the race of the applicants at any of the stores. (Sales-Stephens Deposition page 36-37.) Plaintiff has, however, presented evidence that the store she managed was staffed primarily with African-Employees (Batka Deposition page 107; DE # 75-3 at 4), and also testified that the Highland and Portage stores were what she called "white stores." ( Sales-Stephens Deposition page 115; DE # 75-1 at 20.)

[7] Neither party directs the court to evidence that reveals Sheryl's last name.

that had applied to the Merrillville store. (DE # 75 at 7; Sales-Stephens Deposition page 38; DE # 75-1 at 14.)

In late 2008, plaintiff began to receive formal written disciplinary warnings. On December 10, 2008, defendant (through Batka) issued plaintiff a written Disciplinary Counseling regarding plaintiff's performance. (DE # 70 at 4-5; DE # 71-12.) In that counseling, Batka listed several specific examples of performance problems he felt plaintiff was having. (DE # 71-12.) Among other things, Batka noted that the conditions at plaintiff's store were "unacceptable" and that plaintiff "must deliver a store that is Ready For Business." (*Id.*)

Batka returned to the Merrillville store in January of 2009. (DE # 75 at 7; Sales-Stephens Deposition page 39; DE # 75-1 at 15.) During a private conversation between plaintiff and Batka, plaintiff asked Batka why he no longer liked her. (Sales-Stephens Deposition page 40; DE # 75-1 at 16.) Batka responded: "It's not that I don't like you. I need you to make changes in the store. I need you to diversify the store." (Sales-Stephens Deposition page 40; DE # 75-1 at 16.) Plaintiff responded that she did not feel the same way, and Batka stated: "[D]o you understand what I'm saying to you? Do you understand, for your career here, you need to hire and diversify the store." (Sales-Stephens Deposition page 40; DE # 75-1 at 16.) Plaintiff responded "yes," and left the office. (Sales-Stephens Deposition page 40; DE # 75-1 at 16.)

Around this same time,[8] Batka told plaintiff that she needed to remove pictures of her biracial children from a refrigerator at the store because "it needs to be a professional environment." (DE # 75 at 7-8; Sales-Stephens Deposition page 112; DE # 75-1 at 18.) Batka did not make any racial comments during this conversation. (Sales-Stephens Deposition page 113; DE # 75-1 at 19.) Other store managers were allowed to display family photos in their offices. (Sales-Stephens Deposition page 113; DE # 75-1 at 19.) Additionally, Batka displayed a picture of his Caucasian daughter on his work-issued computer. (Sales-Stephens Deposition page 115; DE # 75-1 at 20.)

Plaintiff brought her concerns about the way she was being treated to Josh Hammerschmidt, Regional Human Resources Manager, in January of 2009. (DE # 75 at 8; Sales-Stephens Deposition page 12; DE # 75-1 at 2.) Plaintiff told Hammerschmidt that Batka was being "unfair" and was "picking on" her. (Sales-Stephens Deposition page 12; DE # 75-1 at 2.) She also told Hammerschmidt that the first Disciplinary Counseling that Batka gave her was not true, and that it seemed like Batka was looking for reasons to give her written disciplinary warnings. (Sales-Stephens Deposition page 13; DE # 75-1 at 3.) Plaintiff told Hammerschmidt that Batka was trying to get her fired, and asked Hammerschmidt what she should do. (Sales-Stephens Deposition page 13; DE # 75-1 at 3.) Hammerschmidt told plaintiff that he had not had any conversations with Batka about firing her, and that Batka was not trying to fire her. (Sales-Stephens

_____

[8] Neither the parties' briefs nor the evidence cited regarding this fact reveal exactly when this alleged event occurred.

Deposition pages 13-14; DE # 75-1 at 3-4.) Hammerschmidt also told plaintiff that she needed to follow Batka's directions, and reminded her that her employment was at will.[9] (Sales-Stephens Deposition page 14; DE # 75-1 at 4.)

Plaintiff did not say anything to Hammerschmidt regarding her belief that Batka's behavior was racially motivated. (Sales-Stephens Deposition page 17, lines 20-23; DE # 75-1 at 7.) Plaintiff also testified that she never told any supervisor or any higher-up at Big Lots about the alleged racial discrimination:

> Q: And you made no complaint or report of anyone at Big Lots regarding what you regarded as racial harassment of you; isn't that right?
> [Objection interposed]
> A: I started the conversation with Josh, and in the beginning of the conversation I understood that it would go – it was not going anywhere. He was not listening to what I was saying. So no, I did not report it to Josh.
> Q: Or anyone else at Big Lots?
> [Objection interposed]
> Q: Is that right?
> A: Anyone above me, no.

(DE # 70 at 10; Sales-Stephens Deposition pages 24-25; DE # 71-5 at 20-21.)

Additionally, plaintiff did not report the alleged photo incident to anyone at Big Lots:

> Q: Did you make any complaint to anyone about having to remove the photographs from the refrigerator?
> A: No. I followed [Batka's] direction and did what he told me to do.
> Q: Did you believe that that was a violation of the race-harassment policy or equal opportunity policy at Big Lots?
> A: I felt it was wrong, yes.
> Q: You felt that it was a violation of the policies?

---

[9] Hammerschmidt denies making the "at-will" comment. (Hammerschmidt Deposition page 183; DE # 71-4 at 4.)

8

A: Yes.
Q: But you never reported it to anybody?
A: No.

(DE # 70 at 10-11; Sales-Stephens Deposition page 116; DE # 71-5 at 72.)

On January 26, 2009, plaintiff was given a second and final Disciplinary Counseling, in which, once again, Batka listed specific examples of performance problems, including that "[a]s store manager[,] [plaintiff] is responsible for store conditions . . . . Store conditions in Merrillville continue to remain unacceptable." (DE # 70 at 5; DE # 71-15 at 2.) The Disciplinary Counseling went on to state that the "Merrillville store must be Ready for Business on a daily basis" and that "[f]ailure to demonstrate immediate improvement and consistent execution to company standards will result in further counseling up to and including termination." (DE # 70 at 5; DE # 71-15 at 2.)

Plaintiff was given her 2008 performance review on February 6, 2009. (Sales-Stephens Deposition pages 78-79; DE # 71-5 at 52-53.) In her 2008 performance review, plaintiff's supervisor rated plaintiff as "unsatisfactory" on "Merchandising" and "requires improvement" on "Operations, staff selection and development, and management skills." (Sales-Stephens Deposition pages 78-79; DE # 71-5 at 52-53.)[10]

---

[10] Defendant contends that plaintiff's overall rating was reduced to "requires improvement" on this performance review. (DE # 70 at 4.) Defendant has not, however, attached that review as evidence in this case, and although portions of plaintiff's deposition testimony might indicate that her overall performance rating was reduced to "requires improvement" on this review, the court cannot conclusively establish this based on the deposition testimony alone. (Sales-Stephens Deposition page 79, lines 5-19; DE # 71-5 at 53.)

On March 20, 2009, plaintiff was given a second final Disciplinary Counseling. (DE # 70 at 5; DE # 71-16.) In that document, Batka states "[Plaintiff] you are failing to meet performance expectations and execute consistent store results and standards as the Store Manager." (DE # 71-16.) The document goes on to list several specific areas where plaintiff's performance was deficient. (*Id.*) The document ends by stating "[plaintiff] must demonstrate immediate and consistent improvement in Store Conditions . . . . Failure to demonstrate improvement will result in further disciplinary action up to and including termination." (*Id.*)

Plaintiff's employment was terminated on May 5, 2009. (Sales-Stephens Deposition page 12; DE # 71-5 at 10.) Plaintiff's termination was recommended by Batka (DE # 79-2 at 3; DE # 79-3 at 2) and approved by Hammerschmidt.[11] (Hammerschmidt Deposition page 42; DE # 71-4 at 3.)

While plaintiff worked for defendant, defendant had a company-wide policy that prohibited all forms of discrimination in the workplace. (DE # 70 at 8; DE # 71-17 at 24-25.) This policy was contained in a handbook defendant gave to its employees.

---

[11] Plaintiff also contends that Hammerschmidt did "not take any steps to corroborate any of the allegations that Mr. Batka alleged against [plaintiff]." (DE # 75 at 8.) For this proposition, plaintiff cites page 56 of her Exhibit D, which is Hammerschmidt's deposition. (*Id.*) Unfortunately, plaintiff did not attach page 56 of Hammerschmidt's deposition (DE # 75-4), and defendant did not either. (DE # 71-4.) In any event, despite plaintiff's contention that Hammerschmidt failed to take any steps to corroborate Batka's allegations, defendant has presented evidence indicating that the opposite is true. (DE # 79-2 at 3; DE # 79-3 at 2.)

(DE # 71-17 at 2.)[12] The handbook specifically states that "[e]qual employment opportunity is given to all associates for job related matters, regardless of race, religious creed, color, age, sex, sexual orientation, gender identity, national origin, religion, marital status . . . ." (DE # 71-17 at 35.) The handbook goes on to state that "[e]ach manager and every associate is expected to adhere to these guidelines in both practice and spirit." (*Id.*) Finally, that section of the handbook states that "[n]o one will be subject to, and the Company prohibits, any form of discipline or retaliation for reporting perceived violations of this Policy, pursuing any such claim, or cooperating in any way in the investigation of such claims." (*Id.*)

In her deposition testimony, plaintiff indicated that she knew that she had an obligation, under the handbook, to report any problem she was experiencing:

> Q: And you understood that you had an obligation if you thought that there was a problem to report it, didn't you?
> A: Yes.

(Sales-Stephens Deposition page 28; DE # 71-5 at 24.) In her deposition, plaintiff also acknowledged that she knew that Big Lots had an anonymous hotline to report violations of company policy, but did not ever use that hotline to report Batka's conduct:

> Q: And if you look over on the left-hand side at the bottom of the first paragraph provides with you [sic] with a Get Real Hot Line [sic], correct? [*See* DE # 71-17 at 35.]

---

[12] Defendant has submitted plaintiff's acknowledgment that she received the Employee Handbook in 1993, (DE # 71-7 at 2), 1995 (DE # 71-8 at 2), 1998 (DE # 71-9 at 2), and 2008 (DE # 71-6 at 2).

A: Yes.

Q: You never called that number?

A: It goes to the Human Resource Department, which is who I called, which was Josh [Hammerschmidt.]

Q: You never called the hot line to make a complaint, did you?

A: No.

Q: And if you felt that you were not being treated correctly by Mr. Hammerschmidt, you could have called the hot line [sic] and gone above Mr. Hammerschmidt; isn't that right?

A: Maybe.

Q: But you never did that?

A: No.

(Sales-Stephens Deposition page 28; DE # 71-5 at 24.)

Plaintiff eventually filed suit against defendant alleging racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964. (DE # 1 at 10.) Defendant has now moved for summary judgment on both of plaintiff's claims.

## II.    Legal Standard

FEDERAL RULE OF CIVIL PROCEDURE 56 requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

The moving party bears the initial burden of demonstrating that these requirements have been met; it may discharge this responsibility by showing that there is an absence of evidence to support the non-moving party's case. *Carmichael v. Village of Palatine, Ill.,* 605 F.3d 451, 460 (7th Cir. 2010) (citing *Celotex,* 477 U.S. at 323). To overcome a motion for summary judgment, the non-moving party must come forward with specific facts demonstrating that there is a genuine issue for trial. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement. *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986)). The nonmoving party must show that there is evidence upon which a jury reasonably could find for him. *Id.*

The court's role in deciding a summary judgment motion is not to evaluate the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 249-50; *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 443 (7th Cir. 1994). On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder. *Payne v. Pauley,* 337 F.3d 767, 770 (7th Cir. 2003) (citing *Anderson,* 477 U.S. at 255). In viewing the facts presented on a motion for summary judgment, the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Chmiel v. JC Penney Life Ins. Co.,* 158 F.3d 966, 968 (7th Cir. 1998); *Doe,* 42 F.3d at 443. Importantly, the court is "not required to draw *every* conceivable inference from the record [in favor of the non-movant]-only

those inferences that are reasonable." *Bank Leumi Le-Israel, B.M., v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) (emphasis added).

## III.  Analysis

### A. Plaintiff's Discrimination Claim

Plaintiff alleges that defendant violated Title VII of the Civil Rights Act of 1964. Specifically, plaintiff alleges that defendant terminated her employment because she is a member of a biracial family. (*See* DE # 1 at ¶  DE # 75 at 14 ("To say that [p]laintiff was fired for poor performance, and not mistreatment regarding her bi-racial family, is pretextual, and fails."). Plaintiff's race discrimination claim appears to be based on a single incident – when Batka told plaintiff to remove pictures of her biracial children from a refrigerator and told plaintiff that "it needs to be a professional environment." (DE # 75 at 7-8; Sales-Stephens Deposition page 112; DE # 75-1 at 18.) Although Batka did not make any racial comments during this conversation, plaintiff contends that Batka asked her to remove the photos because plaintiff's children are biracial, and also contends that the fact that she had a biracial family ultimately led to her termination. (*See* DE # 75 at 14.)

Title VII forbids an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [the individual's] compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may prove employment discrimination under Title VII using either the "direct method" or

the "indirect method." *See, e.g., Cerruti v. BASF Corp.,* 349 F.3d 1055, 1060-61 (7th Cir.

2003). Under the direct method of proof, a plaintiff must show through the

preponderance of direct and/or circumstantial evidence that the employer's decision to

take an adverse job action against the plaintiff was motivated by an unlawful purpose,

such as race or national origin. *Id.* at 1061. The indirect method provides a burden-

shifting framework in which a plaintiff who establishes a prima facie case enjoys a

presumption of discrimination which requires the defendant to articulate a legitimate

non-discriminatory reason for its actions. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792,

802 (1973).

The direct method of proof utilizes both direct and circumstantial evidence that

goes straight to the issue of intent. Direct evidence of discrimination is, essentially, an

acknowledgment of discriminatory intent by the defendant or its agents, without

reliance on inference or presumption. *Robin v. Espo Eng'g Corp.,* 200 F.3d 1081, 1088 (7th

Cir. 2000); *see also Gorence v. Eagle Food Ctrs., Inc.,* 242 F.3d 759, 762 (7th Cir. 2001); *Mojica

v. Gannett Co.,* 7 F.3d 552, 561 (7th Cir. 1993). By way of example, the statement "I fired

Judy because she was an old woman" proves intentional discrimination against Judy

based on her age; thus it is direct evidence. *Gorence,* 242 F.3d at 762. In contrast, the

statement "Old women are hard to deal with," without more, does not prove

intentional discrimination against Judy based on her age, and thus it is circumstantial

evidence. *Id.; see also Rogers v. City of Chi.,* 320 F.3d 748, 753 (7th Cir. 2003) ("Direct

evidence essentially requires an admission by the decision-maker that his actions were

based upon the prohibited animus.") (citation and internal quotation marks omitted). A plaintiff can survive summary judgment by producing either type of evidence as long as it creates a triable issue on whether discrimination motivated the employment action. *Diaz v. Kraft Foods Global, Inc.,* 653 F.3d 582, 587 (7th Cir. 2011).

Plaintiff does not address whether she is relying on the direct or indirect theory of proof for her discrimination claim. Because plaintiff has not directed the court to any acknowledgment of discriminatory intent by defendant or presented "enough circumstantial evidence to allow a rational jury to infer that discriminatory intent motivated" her firing, *Martino v. W. & S. Fin. Group*, 715 F.3d 195, 201-02 (7th Cir. 2013), and because plaintiff's response brief focuses on the indirect method of proof, the court will assume that plaintiff is only proceeding under the indirect method of proof for her discrimination claim.

Using the indirect, or "burden-shifting," method, the plaintiff carries "the initial burden under the statute of establishing a prima facie case of . . . discrimination." *McDonnell Douglas Corp.,* 411 U.S. at 802. To establish a prima facie case of discrimination, a plaintiff must offer evidence that: (1) she is a member of a protected class; (2) her job performance was meeting the employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) she was replaced.[13] *Coleman v.*

---

[13] The elements of a prima facie case vary based on the factual circumstances, *McDonnell Douglas Corp.,* 411 U.S. at 802 n.13, and the fourth element is often inaccurately phrased. *See Pantoja v. American NTN Bearing Mfg. Corp.*, 495 F.3d 840, 845-46 (7th Cir. 2007). The treatment of similarly-situated employees is relevant to, and so the fourth element in, traditional reduction-in-force cases, *see, e.g., Bellaver v. Quanex*

*Donahoe,* 667 F.3d 835, 845 (7th Cir. 2012); *Tice*, 761 F.2d at 1212. Once such a showing is made, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *Donahoe,* 667 F.3d at 845. If the employer does so, then the burden shifts back to the plaintiff to offer evidence suggesting that the offered explanation is a pretext for discrimination. *Id.*

Defendant concedes, for the purposes of summary judgment, that plaintiff can satisfy the first two elements of a prima facie race discrimination claim. (*See* DE # 70 at 12 n.3.) Defendant argues, however, that plaintiff cannot show that she suffered an adverse employment action or that another similarly situated individual who was not in the protected class was treated more favorably.[14] (*Id.* at 12.)

Defendant argues that plaintiff's discrimination claim fails because plaintiff did not suffer an adverse employment action as a result of the photo incident. (DE # 70 at

---

*Corp.,* 200 F.3d 485, 494 (7th Cir. 2000); *Oxman v. WLS-TV*, 846 F.2d 448, 453-55 (7th Cir. 1988). In the present case, based on termination of employment, the fourth element is that the position remained available or was filled by someone else. *See, e.g., McDonnell Douglas Corp.*, 411 U.S. at 802 (fourth element rejected applicant must show is that position remained open and employer continued to seek similar applicants); *Tice v. Lampert Yards, Inc.*, 761 F.2d 1210, 1212 (7th Cir. 1985) (fourth element terminated employee must show is that employer replaced him); *Troyer v. Board of Trustees of Purdue University*, No. 3:09 CV 89, 2012 WL 1074267, at *6 n.4 (N.D. Ind. Mar. 28, 2012) (same). Neither defendant nor plaintiff has addressed whether plaintiff's position remained available or was filled by someone else.

[14] Defendant appears to assume that firing someone for being part of an interracial family violates Title VII. The court will do so as well. *See Ineichen v. Ameritech*, 410 F.3d 956, 962 (7th Cir. 2005) ("Because [defendant] assumes that firing someone for dating a person of a different race would violate Title VII, in the context of this case, we assume so as well but without deciding the question of law."); *see also* DE # 30 at 11-12.

12-13.) This argument is based on the assumption that plaintiff contends that the only adverse employment action that she suffered on account of being a member of a biracial family was being asked to take down the pictures of her children. Plaintiff, however, is contending that she was terminated because she is a member of a biracial family. (DE # 75 at 14). Because termination from employment is clearly an adverse employment action, *Matthews v. Donahoe,* 493 F. App'x 796, 800 97th Cir. 2012),[15] plaintiff has met the third element of the indirect method.

As for the fourth element, both parties incorrectly evaluate plaintiff's claim under the "similarly situated" analysis, which applies to reduction-in-force cases, but not a termination case, like in the case at hand. *See Troyer*, 2012 WL 1074267, at *6 n.4. The fourth element in a termination case is that the position remained open or was filled by someone else. *Id.*; *see also Tice*, 761 F.2d at 1212. Because the parties did not correctly identify the fourth element, neither party has addressed what happened to

---

[15] Defendant also argues that plaintiff cannot show that the photo incident, plaintiff's evidence of discrimination regarding her membership in a biracial family, had anything to do with her termination. (DE # 70 at 12-13.) This argument is based on *Ineichen v. Ameritech,* a case in which the plaintiff, a white women, brought a discrimination claim, alleging that she was fired for dating a black man. 410 F.3d 956, 961-63 (7th Cir. 2005). The plaintiff in *Ineichen* proceeded only under the direct method, and the court granted the defendant's motion for summary judgment on plaintiff's discrimination claim because the plaintiff had failed to provide sufficient direct evidence that the defendant had discriminated against her based on her interracial relationship. *Id.* at 963. But that case dealt with a plaintiff proceeding under the direct method. As noted above, in this case, plaintiff is proceeding on her race discrimination claim under the indirect method. Defendant limits its motion for summary judgment to arguing that plaintiff cannot make out a prima facie case of discrimination. (DE # 70 at 11-15), and defendant's argument regarding the connection between the photo incident and plaintiff's termination is not relevant to this stage of the indirect method analysis.

plaintiff's position after she was terminated. Although plaintiff has not shown that the fourth element was met in this case, it was defendant that incorrectly identified the fourth element in its motion for summary judgment. The court will not fault plaintiff for failing to correctly identify the fourth element, and therefore, will assume that the fourth element has been met.

Because plaintiff has made out a prima facie case of discrimination, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for its actions. *Donahoe,* 667 F.3d at 845. Defendant does not make any argument beyond its argument that plaintiff cannot meet her initial prima facie burden (DE # 70 at 11-15), however, and its motion for summary judgment is therefore denied as it relates to plaintiff's discrimination claim.

## B. Plaintiff's Retaliation Claim

Plaintiff also alleges that defendant violated Title VII by retaliating against her for refusing to follow Batka's alleged instructions to fire African-American employees. (DE # 75 at 10.) Title VII's anti-retaliation provisions make it unlawful "for an employer to discriminate against any . . . employee[ ]" who (1) "has opposed any practice made an unlawful employment practice by this subchapter," or (2) "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Colloquially, the first provision is known as the "opposition clause," and the second as the "participation clause."

*Crawford v. Metropolitan Gov't of Nashville and Davidson County, Tenn.*, 555 U.S. 271, 274 (2009).

In a case alleging unlawful retaliation under Title VII, a plaintiff may survive summary judgment by using either the "direct" or "indirect method" of proof to establish that a trial of her claim(s) is necessary. *Szymanski v. County of Cook*, 468 F.3d 1027, 1029 (7th Cir. 2006). Under the direct method, a plaintiff must point to evidence showing that she: 1) engaged in a statutorily-protected activity; 2) suffered an adverse employment action; and 3) a causal connection exists between the two events. *See Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 657 (7th Cir. 2012) (stating elements in context of ADEA claim).

Under the indirect method, a plaintiff must show: "(1) she engaged in statutorily protected activity; (2) she met the employer's legitimate expectations; (3) she suffered an adverse employment action;" and (4) the position remained available or was filled by someone else. *Id*. at 657-58; *Tice*, 761 F.2d at 1212. Once a plaintiff does so, the familiar "burden-shifting" method is employed: the defendant must articulate a legitimate reason for the adverse action and, if it does so, the plaintiff must then offer evidence suggesting that reason is unworthy of belief and a pretext to cover an unlawful employment action. *McDonnell Douglas Corp.*, 411 U.S. at 802; *Keeton v. Morningstar, Inc.*, 667 F.3d 877, 884-85 (7th Cir. 2012).

### i. Direct Method

#### a. Statutorily Protected Activity

Defendant first argues that plaintiff's retaliation claim fails under the direct method because plaintiff cannot establish the first element of that test – that she engaged in statutorily protected activity. (DE # 70 at 16.) Although plaintiff does not explicitly state whether she is relying on the participation clause or the opposition clause (DE # 75 at 10), because plaintiff has not presented any evidence that she was involved in any way with any "investigation, proceeding, or hearing," 42 U.S.C. § 2000e-3(a), the court will assume that plaintiff contends that her alleged protected activity falls under the opposition clause. Plaintiff has identified three possible instances of protected activity. (DE # 75 at 10.) The court will address each in turn.

First, plaintiff argues that she engaged in protected activity when she called Sheryl, the manager of the Portage store. (*Id.*) During that conversation, plaintiff told Sheryl that she believed that Batka's instructions were racially motivated. (Sales-Stephens Deposition page 17; DE # 75-1 at 7.) In response, Sheryl told plaintiff that she should talk to Hammerschmidt. (Sales-Stephens Deposition page 17; DE # 75-1 at 7.) As defendant points out (DE # 79 at 5), there is no evidence that Sheryl had any authority to resolve plaintiff's problem, and Sheryl, in fact, told plaintiff to call Hammerschmidt, someone who was in a position to address plaintiff's concerns. *See Gleason v. Mesirow Financial, Inc.,* 118 F.3d 1134, 1147 (7th Cir. 1997) (defendant entitled to summary judgment on plaintiff's retaliatory discharge claim because plaintiff failed to report harassment to anyone "in authority"). Plaintiff's retaliation claim therefore cannot proceed based on her conversation with Sheryl.

21

Next, plaintiff asserts that she engaged in protected activity when she called Hammerschmidt to complain about Batka. (DE # 75 at 10.) As noted above, in her conversation with Hammerschmidt, plaintiff told Hammerschmidt that Batka was being "unfair" and was "picking on" her. (Sales-Stephens Deposition page 12-13; DE # 75-1 at 2-3.) She also told Hammerschmidt that the first Disciplinary Counseling that Batka gave her was not true, and that it seemed like Batka was looking for reasons to give plaintiff written disciplinary warnings. (Sales-Stephens Deposition page 13; DE # 75-1 at 3.) Additionally, plaintiff told Hammerschmidt that Batka was trying to get her fired, and asked Hammerschmidt what she should do. (Sales-Stephens Deposition page 13; DE # 75-1 at 3.) Hammerschmidt told plaintiff that he had not had any conversations with Batka about firing plaintiff, and that Batka was not trying to fire her. (Sales-Stephens Deposition page 13-14; DE # 75-1 at 3-4.) Hammerschmidt told plaintiff that she needed to follow Batka's directions, and reminded her that her employment was at will. (Sales-Stephens Deposition page 14; DE # 75-1 at 4.) Plaintiff, however, made no mention of the fact that she believed Batka was asking her to terminate employees based on their race.

With regard to plaintiff's conversation with Hammerschmidt, defendant argues, correctly, that "general complaints to an employer that fail to give the employer notice that the employee is opposing an activity made unlawful by Title VII are not a form of protected activity."(DE # 70 at 17 (quoting *Troyer*, 2012 WL 1074267, at *7); *see also Tomanovich v. City of Indianapolis,* 457 F.3d 656, 663–64 (7th Cir. 2006). Plaintiff has not

responded to this argument. (*See* DE # 75.) The court agrees that plaintiff has failed to present any evidence that her conversation with Hammerschmidt put Hammerschmidt on notice that plaintiff was complaining about Batka's alleged racially discriminatory instructions. Therefore, this was not an activity that was protected by Title VII, and plaintiff cannot survive summary judgment on this basis.

Finally, plaintiff argues that she engaged in protected behavior when she "refused to diversify her store in the manner suggested, and thereby opposed the discriminatory behavior." (DE # 75 at 10.) Plaintiff directs the court to the Supreme Court's recent decision in *Crawford v. Metro. Gov't of Nashville & Davidson County, Tenn.*, where the Court, while discussing the "opposition clause," stated: "And we would call it 'opposition' if an employee took a stand against an employer's discriminatory practices not by 'instigating' action, but by standing pat, say, by refusing to follow a supervisor's order to fire a junior worker for discriminatory reasons." 555 U.S. 271, 277 (2009). Plaintiff contends that *Crawford* shows her refusal to "diversify" her store as Batka directed is protected conduct that meets the first prong of the direct method of proof. (DE # 75 at 10-11.)

In response, defendant argues that *Crawford* has no application in the present case because the issue in *Crawford* was whether Title VII's retaliation protections extended to an employee who spoke out about discrimination not on her own initiative, but rather in response to a question from her employer. *Crawford*, 555 U.S. at 273. Thus, defendant argues that *Crawford* is factually distinguishable from the case at hand.

(DE # 79 at 9-10.) Defendant further argues that the Court specifically "limited its holding, stating that it 'should not extend beyond employees who testify in internal investigations . . . .'" *Id.* (quoting *Crawford*, 555 U.S. at 281.) That quote, however, is not actually from the majority's opinion, but instead comes from the two-justice concurrence written by Justice Alito. *See Crawford*, 555 U.S. at 281 (Alito, J., concurring).

Long before the Supreme Court decided *Crawford*, the Seventh Circuit decided a case involving a "passive resistance" Title VII retaliation claim. In *McDonnell v. Cisneros*, one of the plaintiffs brought a Title VII retaliation claim against his former employer alleging that the employer had fired him for failing to prevent his subordinate from filing a discrimination complaint. 84 F.3d 256, 257-58 (7th Cir. 1996). The Seventh Circuit described the plaintiff's opposition as passive, but still concluded that the plaintiff had stated a claim for Title VII retaliation. The court specifically stated:

> [The plaintiff's] "opposition" was passive. It consisted only of failing to carry out his employer's desire that he prevent his subordinates from filing discrimination complaints. Passive resistance is a time-honored form of opposition, however, and it would be very odd to suppose that Congress meant a form of behavior that straddles what the cases, characterizing the dual structure of the retaliation provision, call "opposition" and "participation" conduct to fall between the stools. The result would be that employers could obtain immunity from the retaliation statute by directing their subordinates to take steps to prevent other workers (as by threat of dismissal or other discipline) from complaining about discrimination.

*Id.* at 262. Thus, even before the Court decided *Crawford*, the Seventh Circuit had endorsed the theory that passive opposition to discrimination can constitute "opposition" under Title VII.

In *Crawford*, the Supreme Court seemed to endorse a position similar to that of

the Seventh Circuit in *Cisneros*:

> "Oppose" goes beyond "active, consistent" behavior in ordinary discourse,
> where we would naturally use the word to speak of someone who has taken
> no action at all to advance a position beyond disclosing it. Countless people
> were known to "oppose" slavery before Emancipation, or are said to
> "oppose" capital punishment today, without writing public letters, taking to
> the streets, or resisting the government. *And we would call it "opposition" if an
> employee took a stand against an employer's discriminatory practices not by
> "instigating" action, but by standing pat, say, by refusing to follow a supervisor's
> order to fire a junior worker for discriminatory reasons.* Cf. *McDonnell, supra,* at
> 262 (finding employee covered by Title VII of the Civil Rights Act of 1964
> where his employer retaliated against him for failing to prevent his
> subordinate from filing an EEOC charge).

*Crawford*, 555 U.S. at 277 (emphasis added).

In this case, plaintiff has presented evidence that the store she managed was

staffed primarily with African-Employees. (Batka Deposition page 107; DE # 75-3 at 4.)

Additionally, plaintiff testified in her deposition that Batka told her to "diversify her

store" in October or November of 2008. (Sales-Stephens Deposition page 34; DE # 75-1

at 11.) In response, plaintiff told Batka that she did not see anything wrong with the

employees her store had at that point. (Sales-Stephens Deposition page 35; DE # 71-5 at

29.) Batka then told plaintiff to hire some new employees for the Christmas season.

(Sales-Stephens Deposition page 35; DE # 71-5 at 29.) During Batka's next visit, in

November of 2008, plaintiff asked Batka to review the applications she had received at

her store with her.[16] (Sales-Stephens Deposition page 36; DE # 75-1 at 12.) Batka did not

---

[16] There is no indication of the race of the applicants.

review any of the applications with plaintiff, but instead told plaintiff that she needed

to start reviewing applications from the Highland and Portage Big Lots locations.[17]

(Sales-Stephens Deposition pages 36-37; DE # 75-1 at 12-13.)

Instead of hiring people from the Highland and Portage stores, as Batka had

suggested, plaintiff hired people that applied to her own store. (Sales-Stephens

Deposition pages 38-39; DE # 75-1 at 14-15.) In January 2009, Batka returned to the store

again. During a meeting with Batka, plaintiff asked Batka why he no longer liked her.

(Sales-Stephens Deposition pages 39-40; DE # 75-1 at 15-16.) Batka responded, "[i]t's not

that I don't like you . . . I need you to diversify the store." (Sales-Stephens Deposition

page 40; DE # 75-1 at 16.) Plaintiff told him that she did not agree. (Sales-Stephens

Deposition page 40; DE # 75-1 at 16.) At that point, plaintiff got up to leave, and Batka

said, "do you understand what I'm saying to you? Do you understand, for your career

here, you need to hire and diversify the store." (Sales-Stephens Deposition page 40;

DE # 75-1 at 16.) Plaintiff responded "yes," and exited the office in which she and Batka

were speaking. (Sales-Stephens Deposition page 40; DE # 75-1 at 16.)

The court believes that a reasonable jury could conclude that Batka's instructions

to plaintiff to "diversify" her store were thinly-veiled attempts to tell plaintiff to fire

black employees and replace them with employees of another race, possibly white

employees because Batka instructed plaintiff to hire employees from two stores that

---

[17] Plaintiff also testified that these store were what she called "white stores."
(Sales-Stephens Deposition page 115; DE # 75-1 at 20.)

plaintiff referred to as "white stores." If a jury were to make that finding, then plaintiff's refusal to carry out Batka's instructions would constitute statutorily protected behavior. *See Cisneros*, 84 F.3d at 257-58; *see also Crawford*, 555 U.S. at 277 ("And we would call it 'opposition' if an employee took a stand against an employer's discriminatory practices not by 'instigating' action, but by standing pat, say, by refusing to follow a supervisor's order to fire a junior worker for discriminatory reasons."); *EEOC v. RJB Properties, Inc.,* 857 F. Supp. 2d 727, 771 n.28 (N.D. Ill. 2012) (recognizing passive resistance as protected activity).

Additionally, a reasonable jury could conclude that Batka believed plaintiff was resisting his alleged attempts to discriminate against African-American workers. *See RJB Properties, Inc.,* 857 F. Supp. 2d at 771 n.28. In January 2009, when Batka told plaintiff that she needed to diversity her store, plaintiff responded that she did not agree. (Sales-Stephens Deposition page 40; DE # 75-1 at 16.) In response, Batka stated: "[D]o you understand what I'm saying to you? Do you understand, for your career here, you need to hire and diversify the store." (Sales-Stephens Deposition page 40; DE # 75-1 at 16.) A reasonable jury could conclude that Batka believed plaintiff was resisting his alleged attempts to terminate African-American employees. Therefore, the court concludes that plaintiff has raised an issue of material fact on whether she engaged in statutorily protected activity.

*Troyer*, a case upon which defendant relies, is distinguishable from the case at hand. No. 3:09 CV 89, 2012 WL 1074267 (N.D. Ind. Mar. 28, 2012). In *Troyer*, the plaintiff

argued that she had engaged in protected activity because she had withstood pressure from her supervisor to terminate an African-American employee. *Id.* at *6-7. The plaintiff's supervisor pressured the plaintiff to fire an African-American employee because the supervisor did not believe that the employee's performance was meeting expectations. *Id.* at *2. The plaintiff suspected, however, that her supervisor was pressuring her to fire the African-American employee because that employee was African-American. *Id.* But the plaintiff never communicated that concern to anyone else at her job. *Id.* The court determined that the plaintiff had not engaged in statutorily protected activity:

> The court has no doubt that it is true that [plaintiff's supervisor] knew that [plaintiff] was opposed to terminating [the African-American employee]. That is completely irrelevant, however, unless [plaintiff's supervisor] knew that the reason [plaintiff] was objecting to [the African-American employee's] termination was that she suspected unlawful discrimination was afoot; general complaints to an employer that fail to give the employer notice that the employee is opposing an activity made unlawful by Title VII are not a form of protected activity. *See Tomanovich,* 457 F.3d at 663–64. The only thing that [plaintiff] ever communicated to [her supervisor] was that she disagreed that [the African-American employee's] performance was poor enough to warrant termination. That is not activity protected from retaliation, and so [plaintiff] cannot defeat summary judgment on this basis.

*Id.* at 7.

In *Troyer* there was no hint of racial discrimination other than plaintiff's private beliefs. In fact, the plaintiff in *Troyer* refused to even accuse her supervisor of racial animus during her deposition. *See id.* at 6 n.6. There was nothing in the *Troyer* supervisor's instructions that could be construed as discriminatory. In this case, in contrast, there is evidence which would allow a reasonable jury to conclude that

plaintiff was instructed by Batka to fire African-American employees on account of their race.[18] Defendant's argument on this point therefore fails.

### b. Causal Link

Defendant also argues that plaintiff's retaliation claim fails under the direct method because plaintiff cannot show a causal link between her statutorily protected activity and her adverse employment action. (DE # 70 at 18.) First, defendant argues that there can be no causal connection when the employer lacks knowledge of the employee's protected activities. (DE # 70 at 16-18); *see also Sitar*, 344 F.3d at 727 ("[A]n employer cannot retaliate when it is unaware of any complaints.") (citation and quotation omitted). ; *see also Troyer*, 2012 WL 1074267, at *6 ("Obviously, a causal connection cannot be shown when the employer lacks knowledge of the employee's protected activities.").

Although plaintiff has failed to provide evidence that anyone above Batka knew of plaintiff's opposition to Batka's instructions, plaintiff's theory on this claim is that Batka was aware of her opposition to his instructions, and that Batka recommended to Hammerschmidt, the ultimate decision maker, that he terminate plaintiff's employment. (DE # 75 at 4, 8, 11-13.) Thus, although plaintiff fails to mention it in her response brief, she appears to be proceeding under the "cat's paw" theory of retaliation.

---

[18] In its reply brief, defendant also points to evidence that plaintiff had complained about several of the employees that Batka allegedly told plaintiff to terminate. (DE # 79 at 8.) While this evidence supports defendant's position, it will be up to the jury to weigh it in consideration with the other evidence.

*Cook v. IPC Int'l Corp.,* 673 F.3d 625, 628 (7th Cir. 2012) ("In employment discrimination law the 'cat's paw' metaphor refers to a situation in which an employee is fired or subjected to some other adverse employment action by a supervisor who himself has no discriminatory motive, but who has been manipulated by a subordinate who does have such a motive and intended to bring about the adverse employment action.").

Under the "cat's paw" theory of retaliation, "in cases involving tangible employment actions . . . the plaintiff is not required to prove that the employer knew or should have known of the non-decisionmaker's discriminatory or retaliatory bias before that bias can be imputed to the employer." *Byrd v. Illinois Dep't of Public Health,* 423 F.3d 696, 709–10 (7th Cir. 2005). "[T]he employer may not be 'conversant with the possible [discriminatory or retaliatory] animus that may have motivated [the non-decisionmaker's] recommendation' but may nonetheless be liable for that animus if it acts as a conduit for the non-decisionmaker's bias." *Id.* at 709 (quoting *Shager v. Upjohn Co.,* 913 F.2d 398, 405 (7th Cir. 1990)).

In 2010, the Supreme Court issued its ruling in *Staub v. Proctor Hospital,* ––– U.S. ––––, 131 S. Ct. 1186 (2011), setting forth a clarified standard with regard to the cat's paw theory as it applied in a Uniformed Services Employment and Reemployment Rights Act of 1994 case. In *Staub*, the Court held that the "recommendations of [non-decision-makers] that were designed and intended to produce the adverse action" may support imposition of liability on the corporate employer. 131 S. Ct. at 1193. According to the Court, the question is whether the non-decision-maker's actions were

a "causal factor," based on common-law proximate cause principles, in the termination decision. *Id.* The Seventh Circuit has applied *Staub* to Title VII cases involving the cat's paw theory. *See, e.g.*, *Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 604 (7th Cir. 2014); *Cook*, 673 F.3d ta 628.

"Proximate cause requires only some direct relation between injury asserted and injurious conduct alleged, and excludes only those links that are too remote, purely contingent, or indirect." *Staub*, 131 S. Ct. at 1192 (citations and quotations omitted). "Therefore, in order to survive summary judgment, [plaintiff] need[s] to provide evidence to support a finding that [Batka's] input was a proximate cause in [her] firing." *Nichols*, 755 F.3d at 604.

As noted above, a reasonable jury could conclude that Batka, the person that recommended that plaintiff's employment be terminated, knew plaintiff's opposition to Batka's instruction to "diversify the store" was based on plaintiff's belief that the instruction was racially motivated. And although defendant has provided some evidence that Hammerschmidt investigated Batka's purported reasons for wanting to fire plaintiff to a limited degree (DE # 79-2 at 3; DE # 79-3 at 2), that evidence also reveals that Batka's input may have factored significantly into Hammerschmidt's decision to terminate plaintiff. Therefore, a question of fact remains as to a causal connection, and defendant's argument on this point fails.

Next, defendant argues that plaintiff cannot show a causal connection in this case because the amount of time between plaintiff's protected activity and the adverse

employment action is too tenuous to support an inference of retaliation. (*See* DE # 70 at

18-19.) The alleged protected activity in this case, plaintiff's refusal to "diversify" her

store as Batka instructed, happened in the fall of 2008 and continued into January of

2009. Plaintiff was terminated on May 5, 2009. Thus, the gap between plaintiff's

protected activity and her termination was approximately 3-4 months.

"Most cases in the Seventh Circuit holding that suspicious timing was not

enough to establish a causal connection of retaliation involved timeframes lasting

longer than a month." *Vega v. Chicago Park Dist.*, 958 F.Supp.2d 943, 956 (N.D. Ill. 2013);

*see also O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 634-35 (7th Cir. 2011) (two month

gap not sufficient to establish causal connection); *Longstreet v. Ill. Dep't of Corr.*, 276 F.3d

379, 384 (7th Cir. 2002) (four month gap insufficient to establish causal connection);

*Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918-19 (7th Cir. 2000) (three-month gap

insufficient to establish causal connection). In this case, because there was a 3-4 month

gap between plaintiff's protected activity and her termination, the timing between the

protected activity and plaintiff's termination is insufficient to establish a causal

connection.

Plaintiff, however, also points to Batka's statement during a January 2009

meeting as evidence of a causal connection. (DE # 75 at 12.) During that meeting, Batka

stated: "[D]o you understand what I'm saying to you? *Do you understand, for your career*

*here, you need to hire and diversify the store.*"(Sales-Stephens Deposition page 40; DE # 75-1

at 16 (emphasis added).) This statement, which was made by Batka, who ultimately

recommended to Hammerschmidt that plaintiff be terminated, could be viewed by a

reasonable jury as a threat of termination if plaintiff did not carry out Batka's alleged

discriminatory plan. Although plaintiff's termination came several months after this conversation, a retaliation claim can proceed despite a lengthy gap between the protected conduct and an adverse employment actions when there are "additional circumstances which raise[] suspicion about the legitimacy of the employer's acts." *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 485 (7th Cir. 1996); *Eversole v. Spurlino Materials of Indianapolis*, 804 F. Supp. 2d 922, 934–35 (S.D. Ind. 2011). Here, the court finds that Batka's alleged statement provides "additional circumstances" that raise suspicion about the legitimacy of plaintiff's termination, and defendant's argument therefore fails. *McKenzie,* 92 F.3d at 485.

Defendant does not argue that plaintiff cannot show the second element of the direct method test – that she suffered an adverse employment action. *Smith*, 674 F.3d at 657. Therefore, defendant's motion for summary judgment on plaintiff's retaliation claim will be denied. The court need not address plaintiff's retaliation claim under the indirect method. *See Paz v. Wauconda Healthcare and Rehabilitation Centre, LLC,* 464 F.3d 659, 666 (7th Cir. 2006) (once direct method has been satisfied, court need not also address indirect method).

## IV.     Conclusion

For the foregoing reasons, defendant Big Lots Store, Inc.'s motion for summary judgment on plaintiff Angela Sales-Stephens's claims is **DENIED**. (DE # 72.)

**SO ORDERED.**

Date: August 28, 2014

 s/James T. Moody                           
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT
