# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | | |
|---|---|---|
| LORINE BLAKELY, LILLIAN M. BROWN, | ) | |
| TIERNEY LOKEY, MABEL OWUSU, | ) | |
| KIA THOMAS, LEOLA NANCY STONE, | ) | |
| JULIA E. ROGERS, VERRETTA TERRY, | ) | |
| ANGELA SALES-STEPHENS, | ) | |
| ANGELA L. WALKER, MARLO WILLIAMS, | ) | |
| MARY B. WILLIAMS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 2:10 CV 342 |
| | ) | |
| BIG LOTS STORES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Defendant Big Lots Store, Inc. ("Big Lots" or "defendant") has moved for

summary judgment on plaintiffs Lorine Blakely, Lillian Brown, Tierney Lokey, Mabel

Owusu, Kia Thomas, Leola Nancy Stone, Julia Rogers, Verretta Terry, Angela L.

Walker, Marlo Williams, and Mary B. Williams's ("plaintiffs") claims against it.

(DE # 66.) Plaintiffs have filed a response to this motion (DE # 76), and defendant has

filed a reply (DE # 80.) For the following reasons, defendant's motion is granted in part

and denied in part.

## I.    Facts

In the summary that follows, the court refers only to undisputed facts, or, if there

is a dispute, notes that it exists and relies on the version of the fact, or inference

therefrom, that is most favorable to the plaintiffs. This summary provides an overview. Additional relevant undisputed facts will be referred to in the analysis that follows.

Big Lots is a national retailer that focuses on selling closeout and discounted merchandise. (DE # 67 at 7; DE # 1 at ¶ 15.) Each of the plaintiffs was previously employed by defendant at defendant's Merrillville, Indiana location ("the store"). (DE # 67 at 7; DE # 1 at 4-5.) Each of the plaintiffs is African American (DE # 67 at 7; DE # 1 at 4-5), and six of the plaintiffs – Lorine Blakely, Lillian Brown, Julia Rogers, Leola Nancy Stone, Verretta Terry, and Mary Williams – were over the age of 40 at the time in which their employment with defendant ended. (DE # 67 at 7; DE # 1 at 4-5.)

Eight of the plaintiffs were full-time employees during their employment with defendant. Plaintiffs Owusu and Stone were Associate Store Managers. (DE # 67 at 7; DE # 1 at 5.) Plaintiff Thomas worked as the store's Furniture Manager. (DE # 67 at 7; DE # 1 at 5.) Plaintiffs Brown, Rogers, and Mary Williams worked as Customer Service Specialists. (DE # 67 at 7; DE # 1 at 4-5.) Plaintiffs Blakely and Terry worked as cashiers. (DE # 67 at 7; DE # 1 at 4-5.) Plaintiffs Walker, Marlo Williams, and Lokey all worked as part-time sales associates at the store.[1] (DE # 67 at 8; DE # 1 at 4-5.)

On July 24, 2009, Big Lots held a store closing meeting at the store to inform its employees that the store would be closed. (DE # 67 at 8; DE # 68-11 at 9.) Several months earlier, defendant had decided to close the store because the store's landlord

_____

[1] Plaintiffs Walker, Marlo Williams, and Lokey will be referred to as "the Part-Time Associates."

would not renegotiate its lease. (DE # 68-1 at 3.) Defendant, therefore, decided to open a new store in a higher-traffic area a few miles away in nearby Hobart, Indiana. (DE # 67 at 8; DE # 68-1.) The store ended up closing in September of 2009, and defendant opened its new Hobart store in October of 2009. (DE # 67 at 8-9; DE # 68-1 at 3.)

The store closing meeting, attendance at which was voluntary, was led by District Manager Thomas Cagle and Regional Human Resources Manager Josh Hammerschmidt. (DE # 67 at 9; DE # 1 at 2.) The meeting was not mandatory because defendant did not want the employees that did not come to the meeting to be disciplined. (DE # 67 at 9; DE # 1 at 2.) Six plaintiffs attended the store closing meeting (Lorine Blakely, Lillian Brown, Julia Rogers, Nancy Stone, Kia Thomas, and Marlo Williams) and five did not (Tierney Lokey, Mabel Owusu, Verretta Terry, Angela Walker, and Mary Williams). (DE # 67 at 9.)

Defendant and plaintiffs give differing accounts as to what happened at the meeting. According to defendant, District Manager Cagle began the meeting by informing the attendees that the store was closing and that because of the business model defendant uses to set up a new store, defendant could not guarantee that any employee would get a full-time position at the new store. (DE # 67 at 9; DE # 68-7 at 4.) After speaking for a short time, Cagle handed the meeting over to HR Manager Hammerschmidt, who then led the rest of the meeting. (DE # 67 at 10; DE # 68-11 at 15.)

According to defendant, at the beginning of the store closing meeting, Hammerschmidt distributed copies of defendant's transfer request form, defendant's

store closing pay policy, and defendant's frequently asked questions relating to store closings. (DE # 67 at 10; DE # 68-11 at 12.) These are the same documents that Hammerschmidt distributes at every store closing meeting he runs. (DE # 67 at 10; DE # 68-11 at 12.) Hammerschmidt also explained that any employee that was interested in transferring to the new store would have to fill out a transfer request form in order to be considered for a transfer. (DE # 67 at 11; DE # 68-11 at 14.) At the end of the store closing meeting, Hammerschmidt took questions and handed out his business card so employees could contact him if they had additional questions. (DE # 67 at 11; DE # 68-11 at 11.)

Plaintiffs, however, testified to completely different accounts of the store closing meeting (for those who attended) and the events that occurred after. The court will now look to each plaintiff's account of the transfer process, construing the facts most favorably to the plaintiffs.

### A. Tierney Lokey

Lokey did not attend the store closing meeting. (DE # 68-14 at 7; Lokey Dep. at p. 53:2-10.) Lokey understood that to transfer to the new store, she was required to fill out the transfer request form and interview for a position at the new store. (DE # 68-14 at 8; Lokey Dep. at p. 60:5-23.) Lokey never reached out to anyone in a position of authority in defendant's hierarchy to find out more information about transferring to the other store. (DE # 68-14 at 9; Lokey Dep. at p. 65:1-15.) Lokey believed she was being pushed to accept the severance pay because it was a better option for the plaintiffs. (DE # 76-23

at 10, Lokey Dep. at p. 108:2-8.) Lokey felt "humiliated" because she was not given a guaranteed position at the new store. (DE # 68-14 at 3; Lokey Dep. at pp. 41:2-42:12.)

### B. Mabel Owusu

Owusu did not attend the store closing meeting, (DE # 68-17 at 7; Owusu Dep. at p. 62:11-14), but she knew that she had to fill out a transfer request form in order to be eligible for a transfer to the new store. (DE # 68-17 at 6; Owusu Dep. at p. 61:3-19.) Owusu's fellow employees told her that the store was closing. (DE # 68-17 at 7; Owusu Dep. at p. 62:20-23.) After learning that the store was closing, Owusu called Hammerschmidt to ask him if he would hold another meeting explaining the store closing process. (DE # 68-17 at 8; Owusu Dep. at p. 67:12-14.) Hammerschmidt told Owusu that he was not going to hold another store closing meeting, and that if she wanted to transfer to the new store, Owusu would have to fill out a transfer request form. (DE # 68-17 at 8-9; Owusu Dep. at pp. 67:22-68:10.)

After speaking with Hammerschmidt, Owusu called corporate headquarters to find out additional information about the transfer process. (DE # 76-5 at 9; Owusu Dep. at p. 92:2-2.) Owusu talked to two individuals who did not understand the transfer process. (DE # 76-5 at 10; Owusu Dep. at p. 102:4-24.) After that, Owusu went to Hobart Store Manager Paul Sierra to ask him about the transfer, and Seirra told Owusu to "take your money and run." (DE # 76-5 at 12; Owusu Dep. at p. 104:2-6.)

### C. Veretta Terry

Terry did not attend the store closing meeting. (DE # 68-35 at 7; Terry Dep. at p. 57:3-16.) Terry learned about the store closing and her transfer options from her fellow employees. (DE # 68-35 at 8; Terry Dep. at p. 61:3-11.) Terry knew that she had to fill out a transfer request form, but did not because she felt that defendant did not want her to transfer to the new store. (DE # 68-35 at 8; Terry Dep. at p. 61:17-20.) Terry thought that defendant did not want her to transfer to the new store because defendant could not tell its employees which store they would be transferring to and because defendant could not guarantee that employees would have the same pay and the same job at a new store. (DE # 68-35 at 8; Terry Dep. at p. 61:22-24.)

Terry did ask manager Jim Villegas about transferring, and he told Terry that he did not know how that process worked. (DE # 68-35 at 10; Terry Dep. at p. 64:6-14.) Terry also called someone at defendant's corporate office to inquire about the transfer process. (DE # 68-35 at 11; Terry Dep. at p. 66:4-14.) The person Terry spoke with at corporate did not know how the transfer process worked. (DE # 68-35 at 12; Terry Dep. at p. 71:13-29.)

### D. Angela Walker

Walker did not attend the store closing meeting. (DE # 68-41 at 7; Walker Dep. at p. 123:17-20.) Walker never asked Hammerschmidt or manager Jim Villegas about what happened at the meeting. (DE # 68-41 at 8-9; Walker Dep. at pp. 128:17-129:4.) After finding out the store was going to be closing, Walker asked Villegas what she had to do

to transfer to the new store, and Villegas told her she needed to fill out a transfer request form. (DE # 68-41 at 12; Walker Dep. at p. 132:6-15.) Walker also asked Villegas for a transfer request form, and he said that he would get back to her with one, but he became busy and never gave Walker a transfer form. (DE # 68-41 at 12-13; Walker Dep. at p. 132:16-133:24.) Walker never made any other attempts to secure a transfer request form. (DE # 68-41 at 14; Walker Dep. at p. 134:1-11.)

Walker eventually asked Villegas again about the transfer slip, and he told her she had missed the deadline to transfer. (DE # 76-9 at 4; Walker Dep. at p. 134:11-17.)

### E. Mary Williams

Mary Williams did not attend the store closing meeting. (DE # 68-45 at 3; Williams Dep. at p. 20:9-11.) Williams learned from her fellow employees that the store would be closing. (DE # 68-45 at 4; Williams Dep. at p. 27:11-24.) Williams never asked anybody at the store what she needed to do to transfer to the new store and never asked anyone for a transfer request form. (DE # 68-45 at 5-6; Williams Dep. at pp. 33:20-34:5; DE # 68-45 at 7-8; Williams Dep. at pp. 35:18-36:3.) Williams never saw any transfer request forms. (DE # 68-45 at 6; Williams Dep. at p. 34:6-9.) Williams made no attempt to transfer to the new store because she was not guaranteed to have the same job or the same pay at the new store. (DE # 68-45 at 9-10; Williams Dep. at pp. 37:17-38:4.)

### F. Lillian Brown

Lillian Brown attended the store closing meeting. (DE # 68-6 at 7; Brown Dep. at p. 106:17-18.) At the meeting, Hammerschmidt explained that all employees could

apply for transfers to the new store, but that there was no guarantee that each employee would get the same position that they previously held. (DE # 68-6 at 8-9; Brown Dep. at pp. 118:16-119:17.) Hammerschmidt also explained that employees who applied for transfers might get jobs at stores other than the new store in Hobart but that were still within a 30-mile radius of the store. (DE # 68-6 at 8-9; Brown Dep. at pp. 118:16-119:17.) Additionally, Hammerschmidt told the employees at the meeting that full-time positions were not guaranteed at the new store, and that if the employees accepted a new position at a different store, they would no longer be entitled to severance pay. (DE # 68-6 at 8-9; Brown Dep. at pp. 118:16-119:17.) Hammerschmidt also told the meeting attendees that he was just there to give them the news, not to answer questions. (DE # 76-10 at 2; Brown Dep. at p. 144:22-24.)

At the meeting, Hammerschmidt told employees that if they wanted to transfer they needed to go into the store's office and fill out a transfer form. (DE # 68-6 at 10; Brown Dep. at p. 122:7-21.) Although she initially began filling out a transfer request form, Brown did not submit the form because she was confused and did not think the transfer process was fair. (DE # 68-6 at 11-12; Brown Dep. at p. 124:12-125:11.) When Brown was told that there was no guarantee that she would get her same position at the new store, she said "forget, it[,]" and did not submit the form. (DE # 68-13 at 10; Brown Dep. at p. 126:14-23; DE # 68-6 at 15-16; Brown Dep. at p. 128:23-12:5.)

**G. Leola Nancy Stone**

Stone attended the store closing meeting. (DE # 68-32 at 9; Stone Dep. at p. 101:11-12.) Stone testified that there were no documents handed out at the meeting, but she received a transfer request form after the meeting from Acting Store Manager Jim Villegas. (DE # 68-32 at 9; Stone Dep. at p. 101:11-18.) Stone later went on to testify that she understood her transfer options:

> **Q**: So if you applied for a full-time transfer but you were only able to get a part-time transfer and you accepted that position, then you would lose out on your severance pay?
> **A**: That's correct.
> * * *
> **Q**: What if you applied for a full-time transfer, were offered a part-time transfer, but turned that down? What did you understand would happen?
> **A**: I would get the severance package and my unemployment.
> **Q**: So you knew that if you applied for a full-time position but there wasn't one available, you could still get your severance and unemployment, correct?
> **A**: Yes.

(DE # 68-32 at 13; Stone Dep. at p. 127:5-21.) Stone's understanding of her options was correct. (*See* DE # 67 at 13-14.)

Stone actually filled out a transfer form requesting a transfer to the new store, and gave it to store manager Jim Villegas. (DE # 68-32 at 3-4; Stone Dep. at p. 31:22-32:10.) She submitted it to Villegas after a conversation in which Stone told Villegas that she wanted to transfer to the new store, and Villegas responded that Stone transferring to the new store was impossible. (DE # 68-32 at 4; Stone Dep. at p. 32:1-23.) After that, Stone contacted Hammerschmidt about the status of her transfer application. (DE # 68-

32 at 6; Stone Dep. at p. 55:6-7.) She left Hammerschmidt a message but Hammerschmidt never called Stone back. (DE # 68-32 at 6; Stone Dep. at p. 55:6-7.)

After failing to find anything out about the status of her transfer application from Hammerschmidt, Stone once again approached Villegas about her transfer, but he "just blew [her] off." (DE # 68-32 at 6; Stone Dep. at p. 55:8-10.) Stone eventually talked with Assistant Store Manager Linda Gaboian about her transfer. (DE # 68-32 at 6; Stone Dep. at p. 55:11-22.) Gaboian told Stone that she did not know the status of Stone's transfer request. (DE # 76-6 at 4; Stone Dep. at p. 53:7-10.) At that point, Stone told Gaboian that she was withdrawing her transfer request because she was frustrated about not knowing where she stood with regard to the transfer. (DE # 76-6 at 5; Stone Dep. at p. 55:11-19.) Stone was also frustrated by the fact that Gaboian already knew she was going to be moved to the new store, but Gaboian could not give Stone any information on Stone's transfer. (DE # 76-6 at 4; Stone Dep. at p. 53:7-19.) Stone also did not think it was fair that it was possible that she would be moved to another store and lose her current position. (DE # 68-32 at 7; Stone Dep. at p. 57:11-16.) Finally, Stone testified that she would not have accepted a part-time position at another store if one had been offered to her. (DE # 68-32 at 17; Stone Dep. at p. 171:8-14.)

**H. Marlo Williams**

Marlo Williams attended the store closing meeting. (DE # 68-43 at 16; Williams Dep. at p. 75:3-4.) At the meeting, Williams tried to pay as much attention as she could, but admitted that she was not "really like paying attention." (DE # 68-43 at 16; Williams

Dep. at p. 75:18-24.) Williams never saw any transfer request forms at the store. (DE # 76-18 at 2; Williams Dep. at p. 31:20-22.) (DE # 68-43 at 4; Williams Dep. at p. 32:3-13.) Although Williams knew that she could get a transfer request form from the office, she never attempted to get a transfer request form because she "figured they didn't want to give us one." (DE # 68-43 at 4; Williams Dep. at p. 32:3-13.) Williams, however, testified that she had "no idea" what that assumption was based on. (DE # 68-43 at 4; Williams Dep. at p. 32:3-14-15.) Williams did not understand the transfer process (DE # 76-18 at 2; Williams Dep. at p. 31:12-22), and did not follow up with anyone to get a better understanding of the process because she felt that Hammerschmidt did not care about her. (DE # 68-43 at 4; Williams Dep. at p. 32:3-13.) Additionally, Williams testified that the managers were acting like they did not want the plaintiffs to go to the new store. (DE # 76-18 at 3; Williams Dep. at p. 77:20-78:14.)

I. **Lorine Blakely**

Blakely was at the store closing meeting. (DE # 68-3 at 5; Blakely Dep. at p. 98:16-18.) Blakely received the transfer request form at the store closing meeting, but did not receive the store closing pay policy or the store closing FAQ document. (DE # 68-3 at 8; Blakely Dep. at p. 111:14-24.) After the meeting, Blakely followed up with Hammerschmidt regarding transferring to the new store, and Hammerschmidt told her to fill out a transfer request form if she wanted to go to the new store. (DE # 68-3 at 9; Blakely Dep. at p. 113:1-24.)

At some point, Blakely asked Acting Store Manager Jim Villegas about the possibility of transferring, and Villegas just laughed in response to her inquiry. (DE # 76-8 at 2; Blakely Dep. at p. 103:7-9.) After the store closing had been made public, a customer asked Blakely, who was working the cash register at the time, whether she would be moving to the new store. (DE # 76-8 at 2; Blakely Dep. at p. 103:10-19.) Before Blakely had an opportunity to respond, Assistant Store Manager Linda Gaboian responded that Blakely would not be transferring to the new store. (DE # 76-8 at 2; Blakely Dep. at p. 103:7-9.)

Blakely did not submit a transfer request form. (DE # 68-3 at 9; Blakely Dep. at p. 113:1-24.) Blakely decided against submitting a transfer request form because she did not believe it was worth it to submit the transfer form when there was no guarantee of employment:

> Because I asked him[2] why was we putting in a transfer. He said we need to put in a transfer to go to the other store.
>
> I said, "Well, what's the purpose? We are in the system for 20 years almost. What is the purpose?" That's the day I think we talked – he kind of explained off the top of our head that if we take the transfer and we can go anywhere, but it doesn't mean that we would get hours, full-time positions. Nothing was guaranteed. We'll be out there taking a risk. So it wouldn't – it didn't pay for us to even put in a transfer.

---

[2] It is unclear from the portions of Blakely's deposition in the record who Blakely was referring to here.

(DE # 68-3 at 6; Blakely Dep. at p. 102:3-14 [all sic]; *see also* DE # 68-3 at 24; Blakely Dep. at p. 189:10-11 ("I did not sign [the transfer request form] because they did not guarantee me anything.").

**J. Julia Rogers**

Rogers attended the store closing meeting. (DE # 68-19 at 10; Rogers Dep. at p. 99:18-24.) Rogers was told at the meeting that if she submitted a transfer request form and was offered a part-time position at another store but declined the offer, she would not get her severance pay. (DE # 68-19 at 11-13; Rogers Dep. at p. 102:21-104:16.) Rogers knew that she had to submit a transfer request form if she wanted to transfer to the new store (DE # 68-19 at 16; Rogers Dep. at p. 128:13-15.) Rogers decided not to submit a transfer form, however, because she did not want to risk being offered a part-time position and losing her severance pay if she turned it down. (DE # 68-19 at 11-13; Rogers Dep. at p. 102:21-104:16.)

**K. Kia Thomas**

Thomas attended the store closing meeting. (DE # 68-38 at 7; Thomas Dep. at p. 73:14-18.) Thomas was given Hammerschmidt's business card at the meeting, but was not given any other documents. (DE # 68-38 at 9; Thomas Dep. at p. 85:1-13.) Thomas eventually found some of the store closing documents online. (DE # 68-38 at 10-11; Thomas Dep. at p. 103:19-104:3.)

Thomas filled out a transfer request form, but eventually withdrew it because she could not get a clear understanding of her transfer options. (DE # 68-38 at 12;

Thomas Dep. at p. 105:9-21.) Specifically, Thomas testified that she was unclear on whether she would still be eligible for severance and unemployment benefits if she was offered a part-time position at the new store but declined the offer. (DE # 76-7 at 3; Thomas Dep. at p. 112:3-9.) Thomas asked both Hammerschmidt and Villegas this question, but she never got an answer. (DE # 76-7 at 3; Thomas Dep. at p. 112:10-19.) Thomas also testified that she did not submit a transfer request form because she did not want to risk taking a part-time job at the new store and losing out on her severance and unemployment benefits. (DE # 68-38 at 14; Thomas Dep. at p. 115:3-20.)

## II.     Procedural History

As a result of not being transferred to the new store, plaintiffs filed the current suit. Plaintiffs, who are all African-American, allege that they were discriminated against due to their race in violation of Title VII of the Civil Rights Act of 1964. (DE # 1.) Additionally, plaintiffs Blakely, Brown, Rogers, Stone, Terry, and Mary Williams allege that they were discriminated against due to their age in violation of the Age Discrimination in Employment Act (ADEA). (*Id.*) Defendant has now moved for summary judgment on all of plaintiffs' claims. (DE # 66.)

## III.     Legal Standard

FEDERAL RULE OF CIVIL PROCEDURE 56 requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S.

317, 322 (1986). "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.,* 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

The moving party bears the initial burden of demonstrating that these requirements have been met; it may discharge this responsibility by showing that there is an absence of evidence to support the non-moving party's case. *Carmichael v. Village of Palatine, Ill.,* 605 F.3d 451, 460 (7th Cir. 2010) (citing *Celotex,* 477 U.S. at 323). To overcome a motion for summary judgment, the non-moving party must come forward with specific facts demonstrating that there is a genuine issue for trial. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement. *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986)). The nonmoving party must show that there is evidence upon which a jury reasonably could find for him. *Id.*

The court's role in deciding a summary judgment motion is not to evaluate the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 249-50; *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 443 (7th Cir. 1994). On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder. *Payne v. Pauley,* 337 F.3d 767, 770 (7th Cir. 2003) (citing *Anderson,* 477 U.S. at

255). In viewing the facts presented on a motion for summary judgment, the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Chmiel v. JC Penney Life Ins. Co.,* 158 F.3d 966, 968 (7th Cir. 1998); *Doe,* 42 F.3d at 443. Importantly, the court is "not required to draw *every* conceivable inference from the record [in favor of the non-movant]-only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M., v. Lee*, 928 F.2d 232, 236 (7th Cir. 1991) (emphasis added).

## IV.    Analysis

Defendant first argues that it is entitled to summary judgment on plaintiffs' race discrimination claims. (DE # 67 at 28.)

Title VII forbids an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [the individual's] compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may prove employment discrimination under Title VII using either the "direct method" or the "indirect method" of proof. *See, e.g., Cerutti v. BASF Corp.,* 349 F.3d 1055, 1060-61 (7th Cir. 2003). Under the direct method of proof, a plaintiff must show through the preponderance of direct and/or circumstantial evidence that the employer's decision to take an adverse job action against the plaintiff was motivated by an unlawful purpose, such as race or national origin. *Id.* at 1061. The indirect method provides a burden-shifting framework in which a plaintiff who establishes a prima facie case enjoys a

presumption of discrimination which requires the defendant to articulate a legitimate non-discriminatory reason for its actions. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).

Using the indirect, or "burden-shifting," method, the plaintiff carries "the initial burden under the statute of establishing a prima facie case of . . . discrimination." *McDonnell Douglas Corp.,* 411 U.S. at 802 . To establish a prima facie case of discrimination, a plaintiff must offer evidence that: (1) he is a member of a protected class; (2) his job performance was meeting the employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated individual who was not in the protected class was treated more favorably. *Coleman v. Donahoe,* 667 F.3d 835, 845 (7th Cir. 2012). Once such a showing is made, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *Id.* If the employer does so, then the burden shifts back to the plaintiff to offer evidence suggesting that the offered explanation is a pretext for discrimination. *Id.*

In its motion for summary judgment, defendant argues that plaintiffs cannot meet the third or fourth requirements of their initial burden on their race discrimination claim.[3] With regard to the third element, defendant argues that plaintiffs did not suffer adverse employment actions. (DE # 67 at 29-34, 35-41.) Specifically, defendant argues that plaintiffs cannot meet the adverse employment action element because none of the

---

[3] Plaintiffs do not appear to be arguing that their race discrimination claim can proceed under the direct method. (DE # 76 at 7-18.)

plaintiffs submitted a transfer form requesting to be considered for a job at the new store. (*Id.*)

In response, plaintiffs argue that they suffered an adverse employment action when defendant failed to transfer the plaintiffs to the new Hobart store. (DE # 76 at 12-17, 20-22.) Plaintiffs concede that they did not fill out transfer request forms, but argue that they can still meet the adverse employment action requirement because they were deterred from submitting transfer forms after defendant presented their options in a confusing manner at the store closing meeting and then refused to clarify plaintiffs' options after the meeting. (DE # 76 at 14-22.)

"If a plaintiff does not apply for a job vacancy that is posted, he cannot make a prima facie case for unlawful discrimination or retaliation under Title VII unless the plaintiff demonstrates that the employer's discriminatory practices deterred plaintiff from applying." *Hudson v. Chicago Transit Authority*, 375 F.3d 552, 558 (7th Cir. 2004). In *International Broth. of Teamsters v. United States*, the Supreme Court held that a plaintiff who did not apply for a job can still proceed under the indirect method if the employer's discriminatory practices deterred her from applying:

> The effects of and the injuries suffered from discriminatory employment practices are not always confined to those who were expressly denied a requested employment opportunity. A consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection.
>
> If an employer should announce his policy of discrimination by a sign reading "Whites Only" on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal

18

rebuffs. The same message can be communicated to potential applicants more subtly but just as clearly by an employer's actual practices by his consistent discriminatory treatment of actual applicants, by the manner in which he publicizes vacancies, his recruitment techniques, his responses to casual or tentative inquiries, and even by the racial or ethnic composition of that part of his work force from which he has discriminatorily excluded members of minority groups. When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application.

* * *

The denial of Title VII relief on the ground that the claimant had not formally applied for the job could exclude from the Act's coverage the victims of the most entrenched forms of discrimination. Victims of gross and pervasive discrimination could be denied relief precisely because the unlawful practices had been so successful as totally to deter job applications from members of minority groups. A per se prohibition of relief to nonapplicants could thus put beyond the reach of equity the most invidious effects of employment discrimination those that extend to the very hope of self-realization. Such a per se limitation on the equitable powers granted to courts by Title VII would be manifestly inconsistent with the "historic purpose of equity to 'secur(e) complete justice' " and with the duty of courts in Title VII cases " 'to render a decree which will so far as possible eliminate the discriminatory effects of the past.' " *Albemarle Paper Co. v. Moody*, 422 U.S., at 418, 95 S.Ct., at 2372.

431 U.S. 324, 365-67 (1977).[4]

---

[4] In its reply brief, defendant argues that plaintiffs cannot show that they suffered an adverse employment action because four African-American associates from the old store transferred to the new store, and therefore, any alleged discriminatory practice by defendant was not "so successful as totally to deter job applications from members of minority groups." (DE # 80 at 10 (quoting *Teamsters*, 431 U.S. at 367).) A reading of that section of the Court's opinion in *Teamsters*, however, does not indicate that a plaintiff must show that an employer's discriminatory practice deterred all minority applicants from applying to a job in order to make a prima facie case under the "deterrence" adverse employment action theory. *See* 431 U.S. at 367. Additionally, defendant does not cite any other authority for this proposition.

Plaintiffs argue that they were deterred from submitting transfer request forms because defendant's store closing meeting was intentionally misleading and because, after the meeting, defendant "evad[ed] the [p]laintiffs and fail[ed] to answer their questions . . . ." (DE # 76 at 16-17.) Both plaintiffs (DE # 76 at 6-9) and defendant (DE # 67 at 21-24) treat plaintiffs as a whole with regard to the issue of whether plaintiffs were deterred from applying for transfers by defendant's discriminatory practices. Each plaintiff, however, went through a very different experience when it came to the store closing meeting and the events that occurred after. Therefore, to determine whether plaintiffs have raised a genuine issue of material fact on this issue the court will need to look at each plaintiff's testimony individually.

### A. Part-Time Associates' Race Discrimination Claims

#### i. Adverse Employment Action[5]

##### a. Tierney Lokey

Lokey did not attend the store closing meeting, but knew that she had to submit a transfer request form in order to transfer to the new store. (DE # 68-14 at 7-8.) Lokey never reached out to anyone to inquire about transferring to the new store.[6] (*Id.* at 9.)

---

[5] In its brief, defendant argues that none of the plaintiffs suffered an adverse employment action because each employee was an at-will employee. (DE # 67 at 33-34.) This is irrelevant. An employer may not illegally discriminate against an at-will employee. *Green v. Am. Fed'n of Teachers/Illinois Fed'n of Teachers Local 604*, 740 F.3d 1104, 1105 (7th Cir. 2014); *see also Dorsey v. Shire Regenerative Med., Inc.*, No. 1:13-CV-1583-WTL-DKL, 2014 WL 1725823, at *2 (S.D. Ind. Apr. 30, 2014).

[6] In their brief, plaintiffs assert that Lokey asked her manager Kia Thomas, about transferring to the new store. (DE # 76 at 21.) Nothing in the pages that plaintiffs cite for

20

Lokey felt "humiliated" that she would not be given a guaranteed position at the new store. (*Id.* at 3.) She also felt pushed to take the severance pay because there were no guaranteed positions at the new store. (DE # 73-23 at 10.)

In their brief, plaintiffs argue that "[b]y evading the Plaintiffs and failing to answer their questions, Defendant effectively deterred the Plaintiffs from submitting a transfer request form." (DE # 76 at 16-17.) The undisputed facts with regard to Lokey, however, show that Lokey knew that she had to fill out the transfer request form, but did not. Additionally, Lokey did not attend the meeting and did not inquire about the transfer process with anyone. Thus, Lokey has failed to present any evidence that defendant's conduct deterred her from applying for a transfer, and defendant is therefore entitled to summary judgment on her race discrimination claim. *Chaib v. Indiana*, 744 F.3d 974, 982 (7th Cir. 2014) ("The requirement that a plaintiff show she suffered an adverse employment action as a result of her employer's alleged discrimination is an element of any Title VII claim, regardless of whether the claim is reviewed under the traditional direct/indirect framework or the less rigid framework our cases have recently suggested.").

### b. Angela Walker

Walker did not attend the store closing meeting. (DE # 68-41 at 7.) After finding out that the store was closing, Walker asked store manager Jim Villegas what she needed to do to transfer to the new store. (*Id.* at 12.) Villegas told Walker that she

---

this fact supports this assertion.

needed to fill out a transfer request form. (*Id.*) Walker also asked Villegas for a transfer request form, and he told her he would get her one, but he became busy and never provided Walker with the form. (*Id.* at 12-13.) Walker made no other attempts to secure a transfer request form, and when she eventually asked Villegas about the form again, Villegas informed her that the deadline to transfer had passed. (*Id.* at 14; DE # 76-9 at 4.)

Although Villegas failed to provide Walker with a transfer request form after she had asked him for one, this, by itself, is insufficient for a reasonable jury to conclude that defendant deterred Walker from applying for a transfer. Walker knew that she had to submit a transfer request form to transfer to the new store, but, other than asking Villegas for a form one time, she made no other efforts to secure and submit a transfer request form. Given these undisputed facts, no reasonable jury could conclude that defendant deterred Walker from applying for a transfer, and defendant is entitled to summary judgment on Walker's race discrimination claim. *Chaib*, 744 F.3d at 982.

### c. Marlo Williams

Williams attended the store closing meeting, but during the meeting she was not "really like paying attention." (DE # 68-43 at 16.) Williams knew that she could get a transfer request form from the office, but chose not to because she "figured they didn't want to give us one." (DE # 68-43 at 4.) Williams, however, testified that she had "no idea" what that assumption was based on. (DE # 68-43 at 4.) Williams did not understand the transfer process, and did not follow up with anyone to get a better understanding of the process because she felt that Hammerschmidt did not care about

her. (DE # 68-43 at 2, 4.) Williams also testified that the managers were acting like they did not want the plaintiffs to go to the new store. (DE # 76-18 at 3; Williams Dep. at p. 77:20-78:14.)

The undisputed evidence shows that although Williams attended the meeting, she did not pay attention to what was being said at the meeting. Williams subjectively believed that defendant did not want her to transfer to the new store, but failed to direct the court to any evidence indicating what she based this belief on. Williams, therefore, has failed to point to any evidence that defendant or its employees did or said anything that deterred her from applying for a transfer. No reasonable jury could conclude that defendant deterred Williams from applying, and defendant is entitled to summary judgment on Williams's race discrimination claim. *Johnson v. Jung*, No. 02 C 5221, 2009 WL 3156743, at *4 (N.D. Ill. Sept. 28, 2009) ("While courts have occasionally loosened [the requirement that plaintiff apply for an open position], they have done so only when discriminatory practices existed to prevent minorities from applying for jobs, not simply when an employee subjectively believed that their application would be futile."), *aff'd sub nom. Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722 (7th Cir. 2013); *Wilkerson v. Menard, Inc.*, No. 2:08 CV 26, 2009 WL 1011099, at *8 (N.D. Ind. Apr. 15, 2009) ("[Plaintiff's] failure [to apply] was not due to procedures or practices on the part of Menards that were intended to prevent minorities from applying for jobs. She simply chose not to do so because she subjectively believed that to do so would be futile . . . ."); *see also Chaib*, 744 F.3d at 982.

Because none of the part-time associates suffered an adverse employment action, defendant is entitled to summary judgment on their race discrimination claims, and the court will now proceed to address the other plaintiffs' race discrimination claims.

**B. Full-Time Managers' Race Discrimination Claim**

**i. Adverse Employment Action**

Defendant also argues that it is entitled to summary judgment on Owusu, Thomas, and Stone's race discrimination claims. (DE # 67.) The court will first analyze whether these three plaintiffs have raised a genuine issue of material fact with regard to whether they suffered an adverse employment action, before moving on to defendant's other argument.

**a. Mabel Owusu**

Owusu did not attend the store closing meeting, but did know that she had to fill out a transfer request form in order to get a job at the new store. (DE # 68-17 at 6-7.) Because she did not understand exactly how the store closing process worked, Owusu called Hammerschmidt and asked him to hold another meeting. (*Id.* at 8.) Hammerschmidt told Owusu that there was not going to be another meeting. (*Id.*) Hammerschmidt also told Owusu that she would need to fill out a transfer request form if she wanted to transfer to the new store. (*Id.* at 8-9.) At that point, Owusu still did not understand her transfer options, so she called corporate headquarters to find out more information, but she was only able to speak to two people who did not know how the transfer process worked. (DE # 76-5 at 9-10.) Finally, Owusu asked Hobart Store

Manager Paul Sierra about the transfer process, and Sierra told Owusu to "take your money and run." (*Id.* at 12.)

In its *Teamsters* opinion, the Supreme Court noted that an employer's "responses to casual or tentative inquiries" can provide evidence that an employee was deterred from applying for a job. 431 U.S. at 365-67. In this case, although Owasu did not attend the store closing meeting, she did try, by contacting a store manager and corporate headquarters, to find out what her transfer options were. Unfortunately, neither the store manager nor corporate headquarters was able to give Owusu enough information to allow her to make an informed decision on submitting a transfer request form. And, instead of answering Owusu's question about the transfer process, Sierra told Owusu to "take your money and run." Given Sierra's refusal to answer Owusu's inquiry, a reasonable jury could conclude that Owusu was deterred from submitting a transfer request form. Defendant's argument on this point therefore fails.

### b. Nancy Stone

Stone attended the store closing meeting, and clearly understood her transfer options. (DE # 68-32 at 11, 13.) Stone submitted a transfer request form to Villegas, despite the fact that Villegas had told her that it would be impossible for her to transfer to the new store. (*Id.* at 3-4.) After she had submitted her transfer request form to Villegas, Stone contacted Hammerschmidt to check on the status of her transfer request. (*Id.* at 6.) Stone was unable to reach Hammerschmidt, so she left a message for him, but he never called her back. (*Id.*) After not hearing back from Hammerschmidt, Stone

25

asked Villegas about her transfer request, but he just blew her off. (*Id.*) Finally, Stone asked store manager Linda Gaboian about her transfer request, and when Gaboian told Stone that she did not know the status of Stone's transfer request, Stone informed Gaboian that she would be withdrawing her transfer request form. (DE # 76-6 at 5.) Stone was frustrated by the fact that no one could tell her the status of her transfer request, and was also frustrated because Linda Gaboian already knew she was going to be moved to the new store. (DE # 76-6 at 4-5.)

Stone attended the meeting, clearly understood her transfer options, and submitted a transfer request form. Although she did not get a response regarding her transfer request as quickly as she would have liked, no reasonable jury could conclude that Stone was deterred from applying for a transfer when defendant clearly explained Stone's transfer options and Stone actually submitted a transfer request form. The fact that defendant did not respond to Stone's request as quickly as she would have liked is not sufficient to raise an issue of material fact on whether she was deterred from applying. Therefore, defendant is entitled to summary judgment on Stone's race discrimination claim. *Chaib*, 744 F.3d at 982.

### c. Kia Thomas

Thomas attended the store closing meeting and was given Hammerschmidt's business card but no other documents. (DE # 68-38 at 7, 9.) Although Thomas eventually found some of the store closing documents online, she was still not sure whether she would receive severance pay if she turned down a part-time position at the

new store. (DE # 68-38 at 10-11; DE # 76-7 at 3.) Thomas reached out to both Hammerschmidt and Villegas to try to get her question answered, but neither provided Thomas with an answer. (DE # 76-7 at 3.) Thomas submitted a transfer request form, but eventually took it back because she could not get a clear understanding of her transfer options.(DE # 68-38 at 12.)

Although Thomas testified that she did not submit a transfer form because she did not want to risk losing her severance and unemployment benefits by taking a part-time job at the new store (DE # 68-38 at 14), Thomas also testified she did not know whether she would get those benefits if she turned down a part-time job at the new store, despite the fact that she tried to get an answer to her question from both Hammerschmidt and Villegas. Given Thomas's uncertainty regarding her transfer options, and the evidence that Hammerschmidt and Villegas would not explain the options to her, a reasonable jury could conclude that Thomas was deterred from submitting a transfer request form. Therefore, defendant's argument on this point fails.

### ii. Similarly Situated Employees

Defendant next argues that the full-time managers cannot show that any similarly situated employees outside their protected class were treated more favorably.[7] (DE # 67 at 40.) In response, plaintiffs identify two individuals that they believe are

---

[7] The court will confine its analysis here to plaintiffs Thomas and Owusu, the two remaining full-time managers.

similarly situated to the full-time managers – Jackie Isaac and Linda Gaboian. (DE # 76 at 17.)

"The similarly situated inquiry is a flexible, common-sense comparison based on 'substantial similarity' rather than a strict one-to-one mapping between employees[.]" *Argyropoulos v. City of Alton*, 539 F.3d 724, 735 (7th Cir. 2008) (citations and quotations omitted). This analysis, however, still requires "enough common features between the individuals to allow [for] a meaningful comparison." *Id.* (citations and quotations omitted). Thus, "[s]imilarly situated employees must be directly comparable to the plaintiff in all material respects, but they need not be identical in every conceivable way." *Coleman*, 667 F.3d at 846 (citations and quotations omitted). "A meaningful comparison is one which serves to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable: complaints about discrimination." *Argyropoulos*, 539 F.3d at 735 (citations and quotations omitted). "The touchstone of the similarly-situated inquiry is simply whether the employees are comparable." *Coleman*, 667 F.3d at 846 (citations and quotations omitted).

"Whether a comparator is similarly situated is usually a question for the fact-finder, and summary judgment is appropriate only when no reasonable fact-finder could find that plaintiffs have met their burden on the issue." *Id.* at 846-47 (citations and quotations omitted). "There must be enough common factors . . . to allow for a meaningful comparison in order to divine whether intentional discrimination was at

28

play." *Id.* at 847 (citations and quotations omitted). "In the usual case a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* (citations and quotations omitted).

The court will first analyze whether Owusu has identified a similarly situated employee, and then move on to analyze the issue with respect to Thomas.

### a. Owusu

At the Merrillville store, Owusu was an Associate Store Manager. (DE # 80 at 13.) Plaintiffs identify two individuals that they believe are similarly situated to Owusu – Jackie Isaac and Linda Gaboian. (DE # 76 at 17.) Gaboian, who is white, was the Assistant Store Manager at the Merrillville store. (DE # 67 at 15, 25.) Both Owusu and Gaboian reported to the store manager Jim Villegas. (DE # 76-15 at 12; DE # 76-17 at 1.) Owusu and Gaboian also had similar job responsibilities. (DE # 76-15 at 2-3; DE # 76-17 at 1.)

Like Owusu (DE # 68-17 at 8), Gaboian did not have all the relevant facts regarding opportunities at the new store. (DE # 76-15 at 6.) Unlike Owusu, who tried unsuccessfully to get more information on the store closing process and transfer opportunities from Hammerschmidt, corporate headquarters, and Paul Sierra (*see supra* pp. 24-25), Gaboian had much more success in getting information regarding the store closing process.

While she was on vacation, Gaboian learned from Villegas that the store was closing, but did not get much additional information until she got back to the store. (DE # 76-15 at 4-5.) On the first day Gaboian got back from vacation, she sat down with Villegas to talk about the store closing. (*Id.* at 6.) The meeting between Villegas and Gaboian lasted ten to fifteen minutes, and included an explanation of what happened at the store closing meeting and what Gaboian would have to do to transfer to the new store. (*Id.* at 6-7.)

Additionally, Gaboian was given a full-time position at the new store. She was hired as a full-time Assistant Store Manager, the same position that she had held at the old store. (DE # 80 at 8.) There is no evidence that Owusu was notified that there was a full-time management position available. Given these facts, Owusu has raised a genuine issue of material fact as to whether Gaboian was a similarly situated employee outside of Owusu's protected class who received more favorable treatment than Owusu did.

Defendant's arguments to the contrary are not persuasive. First, defendant argues that there is no evidence that the meeting between Gaboian and Villegas was anything more "than an informal exchange in the store between two members of management[.]" (DE # 80 at 8.) Gaboian's testimony on this issue, however, reveals that this exchange lasted at least ten minutes and involved Villegas explaining her transfer options and what happened at the store closing meeting. (DE # 76-15 at 4-7.) This is sufficient to raise an issue of fact on whether Gaboian was treated more favorably than Owusu.

Next, defendant argues that there is no evidence that any plaintiff applied for the Assistant Store Manager position that Gaboian received or that any plaintiff was qualified for that position. (DE # 80 at 8.) Defendant, however, has failed to direct the court to any evidence that it made any of the plaintiffs aware that applying for this position at the new store was even a possibility. Defendant's argument on this point therefore fails.

Finally, Defendant also argues that Owusu fails the similarly situated test because there were no full-time positions available to her at the new store and that Owusu would not consider taking a part-time position. (DE # 80 at 13.) As noted earlier, Owusu and Gaboian had similar job responsibilities, and there is no evidence that Owusu was made aware of the opportunity to transfer to the new store as a full-time manager. This argument therefore fails. Because defendant makes no argument other than that Owusu cannot make out a prima facie case (DE # 67 at 35-41), defendant's motion for summary judgment is denied as to Owusu's race discrimination claim.

### b. Thomas

At the Merrillville store, Thomas was the furniture manager. (DE # 80 at 13.) Plaintiffs contend that Thomas was similarly situated to Jackie Isaac, a white woman that had been employed as an associate at the defendant's Portage location, but that transferred to the Hobart store once it had opened. (DE # 76-14 at 2-4.) Plaintiffs contend that Isaac was treated more favorably than Thomas because Isaac received

personal assistance in filling out the transfer form and was also considered for a full-time associate position at the Hobart store. (DE # 76 at 18.)

Plaintiffs direct the court to a series of emails sent by Josh Hammerschmidt, Tom Myron, and Angela Mock, discussing the hiring of Isaac at the new store. (DE # 76-11.) In response, defendant argues that these emails are inadmissible hearsay. (DE # 80 at 6-7.) Under Federal Rule of Evidence 801(d)(2), a statement by an opposing party offered against that party is not hearsay if the statement "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed[.]" Fed. R. Evid. 801(d)(2)(D).

When these emails were sent, Tom Myron was one of defendant's Regional Vice Presidents, Josh Hammerschmidt was a Regional Human Resources Manager, and Angela Mock was a Regional Associate Relations Manager. (DE # 76-11.) All of these emails were sent from each individual's Big Lots' email account, and each email concerned hiring at the new Hobart store. (*Id.*) Therefore, these emails are admissible as non-hearsay under Rule 801, and the court will consider the emails. *Stephens v. Erickson*, 569 F.3d 779, 793 (7th Cir. 2009) ("For an agent's statement regarding an employment action to constitute an admission, she need not have been personally involved in that action, but her duties must encompass some responsibility related to the decisionmaking process affecting the employment action." (citations and quotations omitted).

There are two facts of note raised in the emails. First, in a series of emails between Myron and Hammerschmidt, it is made clear that the people doing the hiring at the new store all agreed that Isaac could transfer to the new store as a full-time associate. (DE # 76-11 at 5-6.) In a different email chain, between Hammerschmidt and Mock, it is revealed that store manager Paul Sierra assisted Isaac in filling out her transfer request form.[8] (DE # 76-11 at 3.)

In response, defendant argues that the emails do not "provide clear evidence about Ms. Isaac's completion of the transfer form, or what, if anything, Sierra did to help her." (DE # 80 at 6-7.) Additionally, defendant directs the court to testimony from Isaac's deposition that indicates that Sierra had no hand in Isaac transferring to the new store. (*Id.* at 7.)

Construing the facts most favorably to plaintiffs, as the court must, however, this evidence indicates that defendant's decision makers agreed to allowing Isaac to transfer to the new store as a full-time associate, while there is no evidence that Thomas was given that same consideration. Additionally, this evidence shows that Sierra may have assisted Isaac in filling out her transfer request form. Thomas, on the other hand, could not get information to make an informed decision on transferring from either Hammerschmidt or Villegas. Thomas, therefore, has raised a genuine issue of material fact on whether a similarly situated comparator was treated more favorably than she

---

[8] It is not clear from the emails that Hammerschmidt and Mock are talking about Isaac. Defendant does not dispute this point, however, so the court will treat it as undisputed. (DE # 80 at 6-7.)

was. Defendant's argument on this point fails. Because defendant makes no argument other than that Thomas cannot make out a prima facie case (DE # 67 at 35-41), defendant's motion for summary judgment is denied as to Thomas's race discrimination claim.

### C. Full-Time Associates' Race Discrimination Claim

#### i. Adverse Employment Action

Defendant also argues that it is entitled to summary judgment on Blakely, Brown, Rogers, Mary Williams, and Verretta Terry's race discrimination claims because they cannot show they suffered an adverse employment action and cannot show that similarly situated employees outside of their protected class were treated more favorably. (DE # 67.) The court will first analyze whether these plaintiffs have raised a genuine issue of material fact as to whether they suffered an adverse employment action.

#### a. Verretta Terry

Terry did not attend the store closing meeting, and learned about the closing and her transfer options from her co-workers. **(**DE # 68-35 at 7-8.) Terry knew she had to fill out a transfer request form. (*Id.* at 8.) In an attempt to figure out what her transfer options were, Terry contacted both Villegas and defendant's corporate headquarters, but did not receive any information from either. (*Id.* at 10-11.) Ultimately, Terry did not submit a transfer request form because she did not think defendant wanted her to transfer to the new store. (*Id.*)

Given Terry's attempts to make an informed decision regarding transferring, and given that she could not get an answer to her questions, a reasonable jury could conclude that Terry was deterred from applying for a transfer. Defendant's argument on this point therefore fails.

### b. Mary Williams

Williams did not attend the store closing meeting, did not ever ask anyone what she needed to do to transfer to the new store, and did not make any attempt to transfer to the new store because she was not guaranteed to have the same job or the same pay at the new store. (DE # 68-45 at 3, 5-6, 9-10.) There is no evidence that a discriminatory practice by defendant deterred Williams from applying to the new store, and no reasonable jury could conclude that Williams suffered an adverse employment action. Defendant is therefore entitled to summary judgment on Williams's race discrimination claim. *Chaib*, 744 F.3d at 982.

### c. Lillian Brown

Brown attended the store closing meeting, and began filling out a transfer request form, but ultimately did not submit it because she was confused and she did not think it was fair that there was no guarantee that she would get the same position at the new store. (DE # 68-6 at 6-7, 10, 15-16.) Although she was confused about the process, Brown has failed to point to any evidence that anyone at the meeting or after the meeting provided her with inaccurate information. Brown testified that Hammerschmidt gave the following information, all of which was true:

- At the meeting, Hammerschmidt explained that all employees could apply for transfers to the new store, but that there was no guarantee that each employee would get the same position that they previously held. (DE # 68-6 at 8-9.)

- Hammerschmidt also explained that employees who applied for transfers might get jobs at stores other than the new store in Hobart but that were still within a 30-mile radius of the store. (DE # 68-6 at 8-9; *see also* DE # 68-40 at 2 (explaining transfer options).

- Hammerschmidt also told the employees at the meeting that full-time positions were not guaranteed at the new store, and that if the employees accepted a new position at a different store, they would no longer be entitled to severance pay. (DE # 68-6 at 8-9; *see also* DE # 68-40 at 4 (explaining that employees cannot take a position at another store and also get severance pay).)

- At the meeting, Hammerschmidt told employees that if they wanted to transfer they needed to go into the store's office and fill out a transfer form. (DE # 68-6 at 10.)

Thus, Brown did not testify that anyone gave her false or misleading information about her transfer options. Given these undisputed facts, no reasonable jury could conclude that defendant deterred plaintiff from submitting a transfer request form, and defendant's motion for summary judgment will be granted as it relates to Brown's race discrimination claim. *Chaib*, 744 F.3d at 982.

### d. Lorine Blakely

Blakely, who attended the store closing meeting, also followed up with Hammerschmidt after the meeting regarding transferring, and was told by Hammerschmidt that she needed to submit a transfer request form. (DE # 68-3 at 5, 9.) Blakely eventually asked a store manager about the possibility of transferring, but the manager just laughed in response to her inquiry. (DE # 76-8 at 2.) Later, when Blakely

was working at the cash register, a customer asked her if she would be moving to the new store, but before Blakely had a chance to respond, a different store manager stepped in and responded that Blakely would not be transferring to the new store. (*Id.*) Ultimately, however, Blakely did not submit a transfer request form because she was not guaranteed the same job or the same hours at the new store. (DE # 68-3 at 6, 24.)

Although there were certainly several incidents that might have deterred her from submitting a transfer request form, Blakely has failed to direct the court to any evidence that either of these incidents had any impact on her decision of whether to submit a transfer request form. Instead, the only evidence the court has on this issue is that Blakely did not submit a transfer request form because it was not guaranteed that she would get the same job and same hours at the new store. Given these undisputed facts, no reasonable jury could conclude that Blakely was deterred from submitting a transfer form. *Chaib*, 744 F.3d at 982.

### e. Julia Rogers

Rogers, who was a full-time employee, attended the store meeting, and was told that if she were to be offered a part-time position at a different store, and declined that offer, she would not be entitled to severance pay. (DE # 68-19 at 10-13.) That information, however, was not true. (DE # 67 at 13-14.) Rogers also testified that she did not submit a transfer request form because she did not want to risk being offered a part-time job, turning it down, and losing out on her severance pay. (DE # 68-19 at 11-13.)

Construing the facts most favorably to Rogers, she was given false information about her transfer options at the store closing meeting. This information would have made submitting a transfer request form much less appealing, and a reasonable jury could conclude that Rogers was deterred from applying for a position at the new store. Defendant's argument on this point therefore fails.

Only full-time associates Rogers and Terry have raised an issue of fact regarding whether they suffered an adverse employment action. The court will move on to defendant's next argument, confining its analysis to those two plaintiffs.[9]

### ii. Similarly Situated Employees

Defendant also argues that plaintiffs Rogers and Terry cannot show that there were other similarly situated employees outside of their protected class that were treated more favorably. (DE # 67 at 40.) In response, plaintiffs argue that Norma Humyak, Bonnie Lang, and Linda Elizondo, who are all white, were treated more

---

[9] Defendant also argues that plaintiffs cannot make out a prima facie case of discrimination because the evidence in this case does not show that they did "'everything within their power to apply for employment.'"(DE # 80 at 10 (quoting *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 576 (1978)). In *Furnco*, the Court held that a group of plaintiffs had made out a prima facie case of discrimination by "proving they were members of a racial minority; they did everything within their power to apply for employment; Furnco has conceded that they were qualified in every respect for the jobs which were about to be open; they were not offered employment . . . and the employer continued to seek persons of similar qualifications." *Furnco Const. Corp.*, 438 U.S. at 576. Once again, there is no indication in *Furnco* that a plaintiff must make an absolute showing that "they did everything within their power" to apply for a position, and defendant has not directed the court to any cases holding that this is a strict requirement. Even if this were a requirement, however, it would be up to the trier of fact to make this determination with regard to the remaining plaintiffs.

favorably than Rogers and Terry because defendant sought out and assisted Humyak, Lang, and Elizondo in transferring to the new store, but made no such effort for either Rogers or Terry.[10] (DE # 76 at 22-24.)

Norma Humyak was a Merrillville store associate that ended up submitting a transfer request form and transferring to the new store. (DE # 67 at 14.) Plaintiffs assert Jim Villegas, the acting store manager, spoke to Norma Humyak individually and helped her complete the transfer request form. (DE # 76 at 23-24.) Plaintiffs direct the court to testimony from plaintiff Owusu, that Jim Villegas explained the transfer options to white employees better than he explained the transfer options to black employees, and that Villegas specifically singled out several white employees, including Humyak, to explain the process to. (DE # 76-5 at 2-3.)

In response, defendant does not argue that Humyak is not similarly situated to Rogers and Terry. (*See* DE # 80 at 6, 11-14.) Defendant argues, however, that the statements from Owusu, discussed above, are hearsay and cannot be considered on summary judgment. (*Id.* at 6.) Hearsay is "an out-of-court statement offered to prove its truth[.]" *Stollings v. Ryobi Technologies, Inc.*, 725 F.3d 753, 761 (7th Cir. 2013); Federal

---

[10] Defendant also argues that the full-time store associates' discrimination claims fail because there were no full-time positions available at the new new store for the full-time associates to fill. (DE # 67 at 38.) As plaintiffs point out (DE # 76 at 18-19), however, in a series of emails between Myron and Hammerschmidt, it is made clear that the people doing the hiring at the new store all agreed that Jackie Isaac could transfer to the new store as a full-time associate. (DE # 76-11 at 5-6.) She did not ultimately transfer as a full-time associate, but she was given special consideration for a full-time position while plaintiffs were not. Defendant's argument on this point therefore fails.

Rule of Evidence 801. Owusu, however, was not testifying as to any statements made by Villegas or her coworkers; but rather, was testifying to her own first-hand observations. This testimony is not hearsay. *United States v. Foster*, 701 F.3d 1142, 1153-54 (7th Cir. 2012).

Considering this testimony in the light most favorable to plaintiffs, Rogers and Terry have raised a genuine issue of material fact as to whether a similarly situated employee outside of their protected class was treated more favorably. Because defendant makes no arguments other than that Rogers and Terry cannot make out a prima facie case under the indirect method, defendant's motion for summary judgment is denied as it relates to these two plaintiffs. (DE # 67 at 35-41); *Gaines v. K Five Const. Corp.*, 742 F.3d 256, 262 (7th Cir. 2014) (plaintiff need only identify one comparator).

### D. Plaintiffs' Age Discrimination Claim

Plaintiffs Blakely, Brown, Rogers, Stone, Terry, and Mary Williams, who were all over the age of 40 when the store closed, also allege that defendant discriminated against them based on their age in violation of the ADEA. "In general, the ADEA provides coverage for private, state, and federal employees who are forty years of age and older . . . ." *Levin v. Madigan*, 692 F.3d 607, 615 (7th Cir. 2012); *see also Guinto v. Exelon Generation Co.*, LLC, 341 F. App'x 240, 245 (7th Cir.2009) ("The ADEA prohibits an employer from discriminating against any person over 40 years of age because of the individual's age."). As with a Title VII claim, a plaintiff may prove an age discrimination claim under either the direct or indirect method. *Cerutti*, 349 F.3d at

1060. In this case, plaintiffs proceed under both the direct and indirect method of proof.

(DE # 76 at 25.)

Under the direct method of proof, a plaintiff must show through the preponderance of direct and/or circumstantial evidence that the employer's decision to take an adverse job action against the plaintiff was motivated by an unlawful purpose. *Cerutti,* 349 F.3d at 1061. The indirect method provides a burden-shifting framework in which a plaintiff who establishes a prima facie case enjoys a presumption of discrimination which requires the defendant to articulate a legitimate non-discriminatory reason for its actions. *McDonnell Douglas Corp.,* 411 U.S. at 802.

The direct method of proof utilizes both direct and circumstantial evidence that goes straight to the issue of intent. Direct evidence of discrimination is, essentially, an acknowledgment of discriminatory intent by the defendant or its agents, without reliance on inference or presumption. *Robin v. Espo Eng'g Corp.,* 200 F.3d 1081, 1088 (7th Cir. 2000); *see also Gorence v. Eagle Food Ctrs., Inc.,* 242 F.3d 759, 762 (7th Cir. 2001). By way of example, the statement "I fired Judy because she was an old woman" proves intentional discrimination against Judy based on her age; thus it is direct evidence. *Gorence*, 242 F.3d at 762. In contrast, the statement "Old women are hard to deal with," without more, does not prove intentional discrimination against Judy based on her age, and thus it is circumstantial evidence. *Id.* A plaintiff can survive summary judgment by producing either type of evidence as long as it creates a triable issue on whether

41

discrimination motivated the employment action. *Diaz v. Kraft Foods Global, Inc.,* 653 F.3d 582, 587 (7th Cir. 2011).

Under either the direct or indirect method of proof, a plaintiff must show that he or she suffered an adverse employment action. *Matthews v. Wisconsin Energy Corp. Inc.,* 534 F.3d 547, 559 (7th Cir. 2008). Defendant first argues that these plaintiffs cannot show that they suffered an adverse employment action because they did not submit transfer request forms. (DE # 67 at 41.) In response, plaintiffs argue that they were deterred from submitting transfer request forms due to defendant's discriminatory practices. (DE # 76 at 28.) As the court explained earlier in its opinion, plaintiffs Rogers and Terry have both raised an issue of fact as to whether they suffered an adverse employment action, and the remaining plaintiffs alleging age discrimination have not. Therefore, defendant is entitled to summary judgment on plaintiffs Blakely, Brown, Stone, and Mary Williams's age discrimination claims.

Rogers and Terry, the remaining plaintiffs, proceed under both the direct and indirect methods of proof. (DE # 76 at 25.) Plaintiffs concede that there is no direct evidence of any derogatory remarks related to their age, and therefore, attempt to raise an issue of fact under the direct method using circumstantial evidence. (*Id.*) Under the direct method, circumstantial evidence:

> "typically includes (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly-situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person

outside the protected class and the employer's reason is a pretext for discrimination."

*Hutt v. AbbVie Products LLC*, 757 F.3d 687, 691 (7th Cir. 2014) (citations and quotations omitted). "A party may combine these various types of evidence to present a convincing mosaic of circumstantial evidence from which a factfinder can make a reasonable inference of discriminatory intent." *Id.* at 691-92 (citations and quotations omitted).

Plaintiffs contend that the following evidence would allow a reasonable jury to infer discriminatory intent:

- Rogers and Terry, who were 55 and 54 at the time the store closed, respectively, made up (along with the other age discrimination plaintiffs whose claims were noted above) the oldest group of employees at the store. (DE # 76 at 25.)

- Although four of the eight employees who transferred to the new store were over the age of 40 (Linda Elizondo (58), Elnora Keith (40), Ne'Shaun Turner (42), and Linda Gaboian (54)), both Keith and Turner were substantially younger than Rogers and Terry. (*Id.* at 25-26.)

- The average age of the eight employees that transferred to the new store was 37.75. (*Id.* at 26-27.)

- District manager Mike Batka told a store manager that she did not have "the right caliber" of employees at her store. (DE # 76-21 at 2.)

- Batka told a store manager that plaintiff Blakely was "dead weight." (*Id.* at 3.)

Evidence "showing that certain hiring practices correlated with a negative effect on minority hiring, although relevant, will not by itself meet the 'more likely than not' standard for a claim of discrimination . . . ." *Norman-Nunnery v. Madison Area Technical*

*Coll.*, 625 F.3d 422, 431 (7th Cir. 2010); *see also Nichols v. S. Illinois Univ.-Edwardsville*, 510 F.3d 772, 782 (7th Cir. 2007) ("[A] plaintiff may use pattern evidence of disparate treatment even if that evidence is not rigorously statistical, although, standing alone, it is insufficient evidence to withstand summary judgment."). Thus although there is evidence that the average age of the employees who transferred to the new store was significantly lower than the age of either Rogers or Terry, and although two of the four employees that were over the age of 40 were substantially younger than Rogers and Terry, this evidence alone is insufficient to withstand summary judgment. *Nichols*, 510 F.3d at 782.

Plaintiffs are therefore left to rely on the two statements from District Manager Mike Batka, noted above. The first statement that Batka made, that the Merrillville store did not have the "right caliber" of employees, lends Rogers and Terry no support. The statement by Batka comes from Angela Sales-Stephens' deposition, and reads as follows:

> We [Sales-Stephens and Batka] were in the furniture department watching Kia Thomas rearrange furniture, discussing hiring for the new Christmas season coming up, discussing employees as they walked by when Mike Batka told me I did not have the right caliber of employees in my store.

(DE # 76-21 at 2.) There is no evidence that this comment was directed at either Rogers or Terry, or any of the other plaintiffs that alleged an age discrimination claim. Additionally, there is no indication that this comment was in any way related to any of the plaintiffs' ages. *See Hutt*, 757 F.3d at 692 (7th Cir. 2014) ("But there is no evidence in

44

the record that Lozen or Westfall, or any Solvay employee, made any comments relating to, or even referencing, Hutt's age.").

As for Batka's other comment, that plaintiff Blakely was "dead weight[,]" there is no indication that this comment had anything to do with Blakely's age. *Id.*; *see also Larimer v. Dayton Hudson Corp.*, 137 F.3d 497, 500 (7th Cir. 1998) ("[Plaintiff] next relies on an April 1992 incident when the district manager told her that she would not be promoted above the position of area manager because she had 'no young, fresh ideas.' Again, we agree with the district court that this statement does not necessarily refer to age."). Therefore, Rogers and Terry have failed to supplement their statistical evidence with additional evidence of discriminatory intent, and no reasonable jury could infer discriminatory intent on these facts alone. *Nichols*, 510 F.3d at 782.

Rogers and Terry also proceed under the indirect method. (DE # 76 at 27.) In order to establish a prima facie case of age discrimination under the direct method, a plaintiff must show that "(1) she was a member of a protected class; (2) she was performing her job satisfactorily; (3) she suffered an adverse employment action; and (4) the employer treated similarly-situated employees outside of the protected class (in this case, younger employees) more favorably.[11] *Hutt*, 757 F.3d at 693. Defendant argues

---

[11] Defendant does not dispute that Rogers and Terry were members of a protected class or that they were performing their jobs satisfactorily. (DE # 67 at 41 n.18.)

that plaintiffs cannot show that defendant treated younger employees more favorably.[12] (DE # 67 at 42.)

As the court noted earlier (*see supra* pp. 39-40), Rogers and Terry have presented evidence that co-worker Norma Humyak, a twenty-seven year old Merrillville store associate (DE # 76 at 28) that ended up submitting a transfer request form and transferring to the new store, was treated more favorably than either Rogers or Terry. Specifically, Rogers and Terry have presented evidence that Acting Store Manager Jim Villegas singled out Humyak individually to explain her transfer options to her. (DE # 76 at 23-24.)

In response, defendant argues that neither Terry nor Rogers can identify any similarly situated individuals because none of the store associates that transferred to the new store were full-time associates or received full-time positions, and there were no full-time associates hired at the new store, (DE # 67 at 40, 42.) A similarly situated comparator, however, need only be "similar enough to permit a reasonable juror to infer, in light of all the circumstances, that an impermissible animus motivated the employer's decision." *Coleman*, 667 F.3d at 841. Here, although Humyak and the other store associates that transferred to the new store were part-time associates, and Rogers and Terry were full-time associates, the difference between full-time and part-time

---

[12] Defendant also argues that Rogers and Terry cannot show that they suffered an adverse employment action. (DE # 67 at 41.) As the court noted earlier, both Rogers and Terry have raised a genuine issue of material fact as to whether they suffered an adverse employment action.

employment does not explain the difference in treatment between Humyak and Rogers and Terry. *Senske v. Sybase, Inc.*, 588 F.3d 501, 510 (7th Cir. 2009) ("[T]he comparators must be similar enough that differences in their treatment cannot be explained by other variables, such as distinctions in their roles or performance histories[.]").

As noted earlier, plaintiffs have presented evidence that store Manager Jim Villegas singled out certain employees, including Humyak, to explain the transfer process to. (DE # 76-5 at 2-3.) In contrast, when Terry asked Villegas how the transfer process worked, he told her that he did not know. (DE # 68-35 at 10.) Additionally, Rogers was given inaccurate information at the store closing meeting that would have made filling out a transfer request form extremely undesirable. (DE # 68-19 at 10-13.) There is evidence that defendant treated Humyak, who is substantially younger than either Rogers or Terry, more favorably, and the fact that Humyak was a part-time employee and Rogers and Terry were full-time employees does not explain this difference in treatment. Therefore, Rogers and Terry have raised a genuine issue of material fact as to whether a similarly situated comparator outside of their protected class was treated more favorably.

Because defendant makes no argument other than that Rogers and Terry cannot make out a prima facie case of age discrimination, defendant's motion for summary judgment on Roger and Terry's age discrimination claim must be denied. (DE # 67 at 41-42.)

**V.**     **Conclusion**

For the foregoing reasons, defendant's motion (DE # 66) for summary judgment

is **GRANTED IN PART AND DENIED IN PART**. Defendant's motion for summary

judgment is granted on all claims by plaintiffs Leola Nancy Stone, Lorine Blakely,

Lillian Brown, Mary Williams, Tierney Lokey, Angela Walker, and Marlo Williams.

Defendant's motion for summary judgment is denied as to all claims by Mabel Owusu,

Kia Thomas, Julia Rogers, and Verretta Terry.

**SO ORDERED.**

Date: June 17, 2015

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT